Guy DONATELLI, Michelle Harman, Scot Rickert, Keith Gross, George Miller, Raymond Pierson, Harry Ross, and Harvey Eck, Plaintiffs,

v.

Robert CASEY, Brenda Mitchell, William Boehm, Frank Pecora, John Perzel, Robert Cindrich, Allen Kukovich, F. Joseph Loeper, Robert Mellow, J. William Lincoln, and Robert Jubelirer, Defendants.

Civ. A. No. 92–7429.

United States District Court,
E.D. Pennsylvania.

March 19, 1993.

Douglas B. MacBeth, Chester Springs, PA, for plaintiffs.

Gregory E. Dunlap, Office of Gen. Counsel, Harrisburg, PA; Patrick C. O'Donnell, O'Donnell & Wright, West Chester, PA; Don A. Innamorato, Reed, Smith, Shaw & McClay, Philadelphia, PA; Mark S. Melodia, W. Thomas McGough, Jr., Reed, Smith, Shaw & McClay, Pittsburgh, PA; Gregory M. Harvey, Morgan, Lewis & Bockius, Philadelphia, PA; John P. Krill, Jr., and Craig P. Wilson, Kirkpatrick & Lockhart, Harrisburg, PA, for defendants.

## OPINION

GAWTHROP, District Judge.

Plaintiffs, Pennsylvania voters residing in the Counties of Chester, Montgomery, Lehigh, and Berks, have brought this action, claiming that defendants have violated their rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Plaintiffs contend that the 1991 Pennsylvania Final Reapportionment Plan, combined with a staggered term system and assignment of an incumbent senator to their district, unduly burdened their right to vote, in violation of equal protection and 42 U.S.C. § 1983. This court has federal question jurisdiction. 28 U.S.C. § 1343; 42 U.S.C. § 1983. Plaintiffs ask this court, *inter alia*, to order an election for the state senatorial seat in the new Forty-fourth Senatorial District, so that its voters may elect the state senator of their choice. Plaintiffs have named as defendants: Governor Robert P. Casey, Secretary of State Brenda K. Mitchell, Commissioner of Bureau of Elections William Boehm, State Senator Frank Pecora, and the members of the 1991 Pennsylvania Reapportionment Commission. Before the court are plaintiffs' and defendants' motions to dismiss [1] and for summary judg-

---

1. Defendants' motions to dismiss under Federal Rules of Civil Procedure Rule 12(b)(6) will be converted into motions for summary judgment under Rule 56, as provided under Rule 12(b).

ment. After submission of briefs and oral argument, I am convinced that plaintiffs' motion must be denied, and defendants' motions granted.

### Background

Because of population changes shown by the decennial census, Pennsylvania state senatorial districts had to be redrawn. Accordingly, the 1991 Legislation Reapportionment Commission was established, pursuant to Article II § 17 of the Pennsylvania Constitution. The Commission was charged with developing a reapportionment plan for both Senate and Representative districts. Under the 1991 Final Reapportionment Plan ("Final Plan"), adopted by the Commission and approved by the Supreme Court of Pennsylvania, 49 of the 50 Pennsylvania senatorial districts were changed in geographic dimensions—some slightly, some considerably, one totally—to create new senatorial districts.

Before the Final Plan was adopted, Senator Frank Pecora represented the 44th state senatorial district, located in Allegheny and Westmoreland Counties in western Pennsylvania. Senator Pecora was reelected as its senator in 1990 for a four-year term. Senator Michael M. Dawida represented the 43rd state senatorial district, also located in parts of Allegheny County. Senator Michael M. Dawida was elected as its senator in 1988 for a four-year term.

After its adoption, the Final Plan merged the general area which had encompassed the 43rd and 44th districts in western Pennsylvania into one district and assigned it the number 43. The Final Plan also established a new senatorial district in eastern Pennsylvania from parts of the Counties of Berks, Chester, Lehigh, and Montgomery and assigned it the number 44. After the Final Plan, Senator Pecora continued to represent the 44th district, now in eastern Pennsylvania, until expiration of his term on the first Monday in January, 1995. Pennsylvania state senators serve staggered four-year terms, half being elected in each successively even-numbered year. Odd-numbered senatorial districts were scheduled to hold and did hold elections in 1992, and the new even-numbered senatorial districts are scheduled to hold elections in 1994.

A number of interested individuals[2] and entities challenged the redistricting scheme, but the Supreme Court of Pennsylvania affirmed, and the Supreme Court of the United States denied certiorari. *In re 1991 Pennsylvania Legislative Reapportionment Commission*, 530 Pa. 335, 609 A.2d 132, *cert. denied sub nom., Loeper v. Pennsylvania Legislative Reapportionment Commission*, — U.S. ——, 113 S.Ct. 66, 121 L.Ed.2d 33 (1992).[3] Meanwhile, Senator Pecora was busy running for Congress in the 18th Congressional District in Allegheny County, but was defeated.

On November 23, 1992, the Pennsylvania State Senate, in addressing the representation of the 44th district, Senator Pecora participating, resolved that no vacancy existed in the new district. The Senate vote was tied at 25, which Lieutenant Governor Singel broke, favorably to Pecora. His qualifications to sit in a vicinage alien to where the people had chosen him were challenged.[4] The Pennsylvania State Senate, however, on January 5, 1993, judged him fit, he himself participating in that vote as well (25–24).

Thus, in an apparently unique feat of legislative levitation and legerdemain, the 44th district was whisked 250 miles across the Commonwealth, replete with its own pre-elected senator, and plopped down upon the

---

The court, in its discretion, considered items outside the pleadings, such as the affidavit of A.L. Stockslager.

**2.** These included: Senator Frank Pecora, the Republican Committee of Chester County, and Senator F. Joseph Loeper.

**3.** The *Rooker–Feldman* doctrine (federal district court does not have jurisdiction to hear constitutional challenges to adjudicatory acts of state supreme court) does not bar this action, because plaintiffs were not parties to the earlier proceedings in the Pennsylvania Supreme Court. *See Valenti v. Mitchell*, 962 F.2d 288 (3rd Cir.1992).

**4.** Apparently, on the basis of Article II, Section 5 of the Pennsylvania Constitution, which reads: "Senators ... shall have been inhabitants of their respective districts one year next before their election ..., and shall reside in their respective districts during their terms in office."

not entirely unsuspecting, but certainly une-lecting, brand new batch of voters in eastern Pennsylvania, as some sort of senatorial manna from the Monongahela.

The 1991 Final Plan substantially changed many senatorial districts. The 44th district is the only one devoid of voters who previous-ly lived within the metes and bounds of its earlier embodiment. All other even-num-bered senatorial districts contain at least 44.7% of the population from the district assigned that number previously. Therefore, unlike the other 24 even-numbered districts, none of the voters residing in the new 44th district, except Senator Pecora, have ever had the opportunity to vote for the state senator who is now representing them.

On December 29, 1992, plaintiffs filed a complaint for equitable and other relief with this court, requesting, *inter alia*, that a spe-cial election for the 44th district be ordered. The parties stipulated to dismiss defendant, Governor Casey, and to dismiss all damage claims against the defendants, Boehm and Mitchell. The remaining defendants filed motions to dismiss, or in the alternative, for summary judgment.

## DISCUSSION

The essence of the constitutional challenge which brings this case to this court is to be found in the Equal Protection Clause, which states that no State shall "deny to any per-son within its jurisdiction the equal protec-tion of the laws." U.S. Constitution, Amend-ment XIV, Section 1. In this context, the challenge is that because of the way the districts were configured, with Senatorial District 44 having been emplaced, upon an assemblage of citizenry, geographically and perhaps philosophically remote from where this particular Senator was elected, has de-prived these citizens of the opportunity to elect their own chosen representative to the Pennsylvania Senate. Complaint, ¶¶ 48, 49.

Plaintiffs argue that this inequality was compounded and exacerbated by the selec-tion of an even number, 44, rather than an odd number, 43, for example. The signifi-cance of the numbers is that under the estab-lished procedure for staggered terms, this district's senator will remain in office until the end of 1994. Thus, the argument goes, the protracted and total denial of senatorial suffrage in the 44th district is of sufficient magnitude and duration so as to make it constitutionally cognizable. Complaint, ¶¶ 51, 52.

■ In determining whether the scheme devised by the Commission runs afoul of the Constitution, this court's first inquiry must be that of determining what is the appropri-ate standard of review. The general rule for the Equal Protection Clause challenges is the rational-basis test, that is, whether the classi-fication drawn by the statute—in this case, by the Legislative Reapportionment Commis-sion, is rationally related to a legitimate state interest. *Cleburne v. Cleburne Living Cen-ter*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) (holding that a city ordinance requiring special permits for homes for the mentally disabled, challenged on equal protection grounds, was not "ration-ally related to a legitimate governmental pur-pose"). The general thinking is that "when social or economic legislation is at issue, the Equal Protection Clause allows the states wide latitudes, . . . and the Constitution pre-sumes that even improvident decisions will eventually be rectified by the democratic pro-cesses." *Id.* at 440, 105 S.Ct. at 3254.

There are two exceptions to this general rule. One arises when a statute classifies by race, alienage, or national origin—factors so seldom relevant to the achievement of any legitimate state interest that they are deemed to reflect prejudice and antipathy, both unworthy bases. For these reasons, because of the unlikelihood of legislative cor-rective amendment, these laws are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compel-ling state interest. *McLaughlin v. Florida*, 379 U.S. 184, 192, 85 S.Ct. 283, 288, 13 L.Ed.2d 222 (1964). This same test is ap-plied by the courts when state laws impinge on personal rights protected by the Constitu-tion. *See Kramer v. Union Free School District No. 15*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969).

At bar, the first class of exceptions—race, etc.—to the general rule concededly does not

apply. The argument is made, however, that because this case involves the right to vote, that is, a personal right protected by the Constitution impinged upon by the state law, it is essential that this court strictly scrutinize the legislative action in question. In support of this argument, plaintiffs rely on *Harper v. Virginia State Board of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) and *Kramer v. Union Free School District,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), where the Supreme Court struck down state voting statutes, using strict scrutiny review. These cases do indeed spring from the electoral context, involving the right to suffrage. They are, however, distinguishable.

*Harper* involved a poll tax. In finding it unconstitutional as affronting the Equal Protection Clause, the Court found that the plaintiff's penury to be akin to the first class of exceptions to the rational relationship test: "Wealth, like race, creed, or color, is not germane to one's ability to participate intelligently in the electoral process. Lines drawn on the basis of wealth or property, like those of race ..., are traditionally disfavored." 383 U.S. at 668, 86 S.Ct. at 1082.

*Kramer* also involved the propriety of drawing an exclusionary line on the basis of property. Mr. Kramer was a bachelor who lived with his parents and neither owned nor leased taxable property in his school district, but was otherwise eligible to vote there. He challenged a New York statute requiring for the eligibility to vote in certain school district elections, either (1) ownership or leasing of taxable reality in the district, or (2) parenthood or custody of children enrolled in the local public schools. The Supreme Court "carefully scrutinized", 395 U.S. at 627, 89 S.Ct. at 1890, the statute because it indefinitely restricted access to the electoral process to discrete groups of voters, e.g. "senior citizens and others living with children and relatives; clergy, military personnel, and others who live on tax-exempt property; boarders and lodgers ..." 395 U.S. at 629, 89 S.Ct. at 1891.

The essence of both *Harper* and *Kramer* is that they involve permanent, or, at least, indefinite, infringements of the franchise to certain classes of voters. The present case involves, rather, the temporary infringement of two years of the right of the plaintiffs to have a vote in determining who will be their state senator. Concededly, two years is not a short time. It is, however, temporary, in that it has a self-executing ending, occurring by the passage of the calendar. The only way the disenfranchisement in *Harper* and *Kramer* could end is by the disenfranchised voters' taking steps to get themselves out of the excluded class. That is a significant distinction. There is a patent absence of any licit purpose in excluding poor people, for example, from the polls. On the other hand, there is a legitimate practical reason for the interim disenfranchisement at bar: in order to try to achieve the worthy, egalitarian, and constitutionally mandated, goal of one-person, one-vote, there must be legislative reapportionment, which necessarily entails some shifting and slippage in the readjustment of legislative boundaries pursuant to the decennial census, and, realistically, some temporary loss of suffrage in the shuffle.

Whether the right to vote is absolute is a question that the Supreme Court of the United States has addressed. In *Rodriguez v. Popular Democratic Party,* 457 U.S. 1, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982), the Court considered the constitutional propriety of a decision to fill a position, vacated by death, in the Puerto Rico House of Representatives, by interim appointment by the political party of whom that decedent had been a member, rather than by popular election. The Court unanimously upheld the procedure, finding that it plainly served a legitimate purpose of insuring that vacancies are filled promptly, without the necessity of the expense and inconvenience of a special election. In so doing, the Court observed that "this court has often noted that the Constitution 'does not confer the right of suffrage upon anyone,' *Minor v. Happersett,* 21 Wall 162 [22 L.Ed. 627] and that 'the right to vote, per se, is not a constitutionally protected right,' *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 35, n. 78, 36 L.Ed.2d 16, 93 S.Ct. 1278 (1973)." (citing cases). Hence, I conclude that this case falls within neither exception to the general rule concerning the

standard of review, and that the test here is indeed whether the legislative action is rationally related to a legitimate state interest.

That conclusion is reaffirmed by several other cases in this context. The leading case in this area, *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), in adjudicating the propriety of one effort at apportionment, uses similar language: "A state can rationally consider", and "as a result of a clearly rational state policy". 377 U.S. at 580, 581, 84 S.Ct. at 1391, 1392. So also, in *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973), the Court reviewed yet another reapportionment plan. In so doing, the Court again, citing *Reynolds v. Sims*, viewed the case from a standpoint "in terms of a claim that a state may 'rationally consider'." 410 U.S. at 327, 93 S.Ct. at 986. Further, in *Ferrell v. Oklahoma*, 339 F.Supp. 73 (W.D.Okl.), *aff'd mem. sub nom. Ferrell v. Hall*, 406 U.S. 939, 92 S.Ct. 2045, 32 L.Ed.2d 328 (1972), a three-judge constitutional panel used the rational-relationship test in going about its duty of constitutional review, an approach the Supreme Court affirmed. An affirmance by the Supreme Court, albeit but by memorandum, has a certain decisional force not to be found in a mere denial of certiorari. *See Shields v. Wainwright*, 813 F.2d 1123 (11th Cir.1987).

In short, the weight of logic and caselaw leads to the conclusion that the test of rational relationship, as opposed to strict scrutiny, is the criterion which must be applied to the scenario at bar.

Having so concluded, it is well to consider just what that test means. Justice Stevens, concurring in *Cleburne, supra*, at 473 U.S. at 452, 105 S.Ct. at 3260, ruminates that "in my own approach to these cases, I have always asked myself whether I could find a 'rational basis' for the classification at issue. The term 'rational' includes a requirement that an impartial lawmaker could logically believe that the classification would serve a legitimate public purpose that transcends the harm to the members of the disadvantaged class. Thus, the word 'rational'—for me, at least—includes elements of legitimacy and neutrality that must always characterize the performance of the sovereign's duty to govern impartially." 473 U.S. at 452, 105 S.Ct. at 3261.

In applying that test to this case, I do recognize, at first, that there is undeniably a disadvantage visited upon the citizens-plaintiffs in question, that is to say, the voters who now find themselves by quirk of legislative quarrel, firmly ensconced within the remarkably ambulatory 44th Senatorial District. It is true that they did not get to vote for the person who is now their senator. It is true that their senator may have political views that are anathema to them, embracing thoughts diametric to their own. It is true as well that because of the numbering, they are going to be stuck with him as their Senator, all things being equal, until the end of 1994. Those disadvantages and political impositions notwithstanding, however, it must also be noted that there are 1,086,454 other voters, in the Commonwealth who are similarly situate, having an electoral stranger thrust upon them—albeit from next door rather than across the breadth of the Commonwealth. (Affidavit of A.L. Stockslager, Population Chart I). And many of those persons, hailing from even-numbered districts, will also be serving out their terms until the end of 1994. This particular District stands out simply because the effect upon it is utterly total: 100%.

In support of this scheme, it must be said that there are a number of rational bases for the Commission's having done what it did. The record reveals that there has been substantial population shift from the western end of the Commonwealth, where the demographic ranks seem to have thinned, to the eastern side of the Commonwealth, where the numbers are growing. (Affidavit of Senator Loeper, Public Hearing of the Legislative Reapportionment Commission, September 25, 1991, p. 11) Obviously, there are various ways to handle this. One would be to have a district-by-district shifting of every district, spilling over from west to east. But this could well create more problems than it solved, and ultimately might disenfranchise more voters in all, than that which was done with the 44th. There are, obviously, a myriad of considerations that go into where to draw the various lines, and each of those

decisions no doubt spawns a concatenation of consequences which reapportionment visits upon voters throughout the Commonwealth. It is not the function of this court to substitute its judgment and rework that representational jigsaw puzzle, that patchwork quilt of democracy, in a way that better suits the fancy of this writer. Rather, the function is a limited one: to determine whether that which was done is so perverse, so riddled with irrationality, as to render the decision unconstitutional. Thus, a legislative determination must be upheld if any facts "reasonably may be conceived to justify it." *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). Put another way, if a legislative determination is "at least debatable," the court should uphold it. *United States v. Carolene Products Co.,* 304 U.S. 144, 153–54, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938). That test fatally undercuts plaintiffs' cause.

Before closing, in contemplating the reasons given by the Commission, I am aware that legislative bodies have been known to profess reasons for their decisions which are not the real ones. Nor am I so naive as to be of the view that this particular reapportionment exercise was done in a way that was purely for the higher and greater good of the cause of democracy, unalloyed by political considerations. Of course politics played a factor. That is to be expected. Whatever the motivations behind the 1991 Final Reapportionment scheme, I must "accord the state's decision, undoubtedly 'passed in response to the state's actual experience in these matters' to be a 'permissible exercise of its discretion'." *Trinsey v. Pennsylvania,* 941 F.2d 224, 235 (3d Cir.1991) (citing *Valenti v. Rockfeller,* 292 F.Supp. 851, 866 (S.D.N.Y.1968). There has been political give-and-take in just about every legislative pronouncement that has come to pass in our country, to include the very Constitution itself—although it is true that that political product is substantially more palatable than the legislative invention being reviewed today. But neither statutory unpalatability— the unsuccessful taking of some sort judicial taste test, nor unimmaculate statutory gene-

sis, is enough to invalidate as unconstitutional the fruits of that political process.

Hence, the order which follows.

## ORDER

AND NOW, this 19th day of March, 1993, for the reasons stated in the accompanying Opinion, Plaintiffs' Cross Motion for Partial Summary Judgment is DENIED.

It is further ORDERED that the Motion of Defendants Robert C. Jubelirer and F. Joseph Loeper for Partial Summary Judgment and Injunctive Relief is DENIED.

It is further ORDERED that the Motions of Defendants Mitchell, Boehm, Mellow, Kukovich, Lincoln, and Pecora to Dismiss and for Summary Judgment are GRANTED.