2 F.3d 508
 Guy A. DONATELLI; Michelle M. Harman; Scott Richert;
Keith Gross; George Miller; Raymond Pierson;
Harry P. Ross; Harvey Eck, Appellants,
v.
Brenda K. MITCHELL; William Boehm; Frank A. Pecora; John
M. Perzel; Robert J. Cindrich; Allen G. Kukovich; F.
Joseph Loeper; Robert J. Mellow; J. William Lincoln;
Robert C. Jubelirer, Appellees.
 No. 93-1293.
 United States Court of Appeals,
Third Circuit.
 Argued July 2, 1993.
Decided Aug. 13, 1993.
 
 Michael M. Baylson (argued), Gerald F. McCormick, Emily H. Hoechst, Duane, Morris & Heckscher, Philadelphia, PA, and Douglas B. MacBeth, Chester Springs, PA, for appellants.
 James J. Haggerty, Gen. Counsel and Gregory E. Dunlap (argued), Deputy Gen. Counsel, Office of Gen. Counsel, Com. of Pennsylvania, Harrisburg, PA, for appellees Brenda K. Mitchell and William P. Boehm.
 Patrick C. O'Donnell (argued), O'Donnell & Wright, West Chester, PA, for appellee Frank A. Pecora.
 Mark S. Melodia, W. Thomas McGough, Jr., Reed Smith Shaw & McClay, Pittsburgh, PA and Don A. Innamorato, Reed Smith Shaw & McClay, Philadelphia, PA, for appellees John M. Perzel and Robert J. Cindrich.
 Annetta Foster Givhan and Gregory M. Harvey, Morgan, Lewis & Bockius, Philadelphia, PA, for appellees Allen G. Kukovich, Robert J. Mellow and J. William Lincoln.
 John P. Krill, Jr. (argued), Linda J. Shorey and Craig P. Wilson, Kirkpatrick & Lockhart, Harrisburg, PA, for appellees F. Joseph Loeper and Robert C. Jubelirer.
 Before: BECKER, ALITO and ROTH, Circuit Judges.
 OPINION OF THE COURT
 EDWARD R. BECKER, Circuit Judge.
 
 
 1
 Eight voters who reside in the newly created 44th state senatorial district in eastern Pennsylvania brought this suit under 42 U.S.C. Sec. 1983, alleging a violation of the Equal Protection Clause. They claim that the 1991 Pennsylvania Reapportionment Plan, and the consequent "assignment" of Senator Frank Pecora (who was elected to the Senate in 1990 from the old 44th district located in western Pennsylvania) to represent the new 44th district for the remaining two years of his term, unconstitutionally saddled them with a representative whom neither they nor any other voter in their district elected. The district court, finding no merit to the claim, granted summary judgment in favor of defendants, various Pennsylvania election officials and the members of the Pennsylvania Legislative Reapportionment Commission. 826 F.Supp. 131.
 
 
 2
 We conclude, as did the district court, that the state actions at issue here are subject only to rational-basis review because they do not involve a suspect classification (i.e. a classification based on race, alienage, or national origin) or burden a fundamental constitutional right. Applying this deferential standard of review, we conclude that the reapportionment plan and the consequent assignment of Senator Pecora to represent the new 44th district are rationally related to legitimate state interests. We therefore will affirm.
 
 I.
 
 3
 In 1991, as required by law, the Pennsylvania Legislative Reapportionment Commission (the "Commission") reapportioned Pennsylvania's state senatorial districts to account for population changes shown by the 1990 decennial census. See Pa. Constitution Art. II, Sec. 17;[1] see also Reynolds v. Sims, 377 U.S. 533, 586, 84 S.Ct. 1362, 1385, 12 L.Ed.2d 506 (1964) ("the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis"). The Final 1991 Reapportionment Plan adopted by the Commission in November of 1991 and approved by the Pennsylvania Supreme Court in February of 1992, see In re 1991 Pennsylvania Legislative Reapportionment Comm'n, 530 Pa. 335, 609 A.2d 132, cert. denied, --- U.S. ----, 113 S.Ct. 66, 121 L.Ed.2d 33 (1992),[2] redrew 49 of the 50 senatorial districts. To accommodate a drastic shift in population from the western to the eastern part of the state, the Reapportionment Plan eliminated completely the old 44th District, located in Allegheny County (dividing the territory in that district among surrounding districts in the western part of the state) and created an entirely new district in the eastern part of the state which was designated as the new 44th district.[3] The 1991 Reapportionment Plan substantially changed many districts, but, with the exception of the new 44th district, all of the redrawn districts included at least some portion of their numerical predecessors.
 
 
 4
 Pennsylvania state senators are elected to four year terms, with half of the senators being elected in even numbered years. Under this staggered election system, which has been mandated by the Pennsylvania Constitution for over 200 years, see Pa. Const. Art. II, Sec. 2, only senate seats in odd-numbered districts were scheduled for reelection in the fall of 1992, just after the 1991 Reapportionment Plan went into effect. The first opportunity to elect a senator in the reapportioned even-numbered districts, including the new 44th district, would not be until the fall of 1994. Consequently, a total of approximately 1.3 million Pennsylvania voters who were shifted by the reapportionment plan into new even-numbered districts would be represented for over two years by a state senator in whose election they had not participated.[4]
 
 
 5
 However, the situation of the approximately 239,000 citizens residing in the new 44th district was different from that of citizens who were shifted into other even-numbered districts in that the new 44th district had no connection to the old 44th district in western Pennsylvania, other than being assigned the number 44. Thus, from all appearances, the new 44th district had no incumbent senator to represent it until the next regularly scheduled general election in 1994. At the time the Reapportionment Plan was adopted in the fall of 1991, some members of the Commission apparently assumed that a special election would be held in 1992 to fill the vacancy in the new 44th district until the 1994 general election. Some members of the Commission apparently also believed that, as a result of the Plan, Senator Pecora, who had been elected in 1990 to represent the old 44th district, would lose his senate seat for the remaining two years of his term because of his district's dissolution, but would have the opportunity to run in 1992 for the open seat in the new 43d district, where his residence was then located as a result of the reapportionment.
 
 
 6
 Events transpired somewhat differently than the Commission foresaw. In the spring of 1992, the Supreme Court of Pennsylvania approved the 1991 Reapportionment Plan against a number of challenges, including one brought by Senator Pecora (who was challenging the alleged dissolution of his senate district). The court announced that Senator Pecora, if approved by the Senate, would be the proper representative of the new 44th District for the remaining two years of his term. See In re 1991 Pennsylvania Legislative Reapportionment Comm'n, 609 A.2d at 140 (Senator Pecora is "not automatically expelled from [his] Senate seat [representing the 44th district] by the Commission's actions. Only the Senate has the authority to judge the qualifications of its members."). The court explained that the final determination of Senator Pecora's eligibility to represent the new 44th district (at least as a matter of state law) was up to the Senate, which, under the Pennsylvania Constitution, has total and unreviewable authority to "judge the election and qualifications of its members." Pa. Const. Art. II, Sec. 9. The Supreme Court thus mooted Senator Pecora's claim that the Plan unfairly ousted him from his Senate seat by dissolving his old district.
 
 
 7
 In November of 1992, after losing his bid for a seat representing the 18th Congressional District in the United States House of Representatives, Senator Pecora moved his residence across the state to the new 44th district, and, on November 23, 1992, the Senate, by a one-vote majority,[5] voted that Senator Pecora was qualified to represent that district until the end of his term in January 1995, having been elected to represent the old 44th district in November 1990.[6] At the start of the new Senate term on January 5, 1993, the Senate again voted (although a second vote was not required), by a one-vote margin, that Senator Pecora was qualified to remain seated and to represent the new 44th district. Thus, by virtue of the Pennsylvania Supreme Court's approval of the 1991 Reapportionment Plan and its interpretation of state law, Senator Pecora became (with the Senate's vote in favor of his qualification) the senator for the new 44th district for the remainder of his term, even though none of the residents of that district had participated in his election in 1990.
 
 
 8
 Plaintiffs, eight voters residing in the new 44th district, brought this suit on December 29, 1992, in the District Court for the Eastern District of Pennsylvania, naming as defendants Secretary of the Commonwealth Brenda Mitchell, Commissioner of Elections William Boehm, Senator Pecora, and the individual members of the Legislative Reapportionment Commission.[7] Plaintiffs claim that the 1991 Reapportionment Plan, as construed by the Pennsylvania Supreme Court and applied by the Pennsylvania Senate to allow the assignment of Senator Pecora to their district, unconstitutionally burdened their right to vote for a state senator and/or to be represented by a state senator who was elected by at least a "core constituency" within their district. As relief, plaintiffs sought: a declaration that the defendants violated the plaintiffs' rights to equal protection of the law; an order requiring Secretary Mitchell and Commissioner Boehm to conduct an election "as soon as possible" for the office of Senator for the 44th Senatorial District; damages, including punitive damages, and attorneys' fees.
 
 
 9
 The defendants filed motions to dismiss or for summary judgment. The plaintiffs also moved for partial summary judgment. State Senators Joseph Loeper and Robert Jubelirer, although named as defendants as members of the Commission, filed a motion for summary judgment in favor of the plaintiffs. Throughout the case, these two "nominal" defendants have agreed with the position of the plaintiffs, arguing that the right of the voters in the new 44th district to equal protection has been violated and that the court should order a special election to fill the senate seat for the district.[8]
 
 
 10
 In its opinion addressing the parties' various motions, the district court was less than charitable towards the challenged actions of the defendants, summarizing the unusual chain of events as follows:
 
 
 11
 [I]n an apparently unique feat of legislative levitation and legerdemain, the 44th district was whisked 250 miles across the Commonwealth, replete with its own pre-elected senator, and plopped down upon the not entirely unsuspecting, but certainly unelecting, brand new batch of voters in eastern Pennsylvania, as some sort of senatorial manna from the Monongahela.
 
 
 12
 See Casey v. Donatelli, 826 F.Supp. 131, 132-33 (E.D.Pa.1993). Nevertheless, the district court rejected the plaintiffs' and nominal-defendants' arguments and granted summary judgment in favor of the defendants. Plaintiffs filed a timely notice of appeal, and the case was expedited by a motions panel of this court.
 
 II.
 A.
 
 13
 Our first step in evaluating a claim that a law or government action violates the Equal Protection Clause is to determine the appropriate standard of review. See Dunn v. Blumstein, 405 U.S. 330, 335, 92 S.Ct. 995, 999, 31 L.Ed.2d 274 (1972). The district court applied rational-basis review, the highly deferential standard of review that is generally applied to state action challenged under the Equal Protection Clause if it "neither proceeds along suspect lines nor infringes fundamental constitutional rights." FCC v. Beach Communications, Inc., --- U.S. ----, ----, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993). Under rational-basis review, the challenged classification must be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Id.; see also Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970).
 
 
 14
 Plaintiffs contend that the district court erred by declining to apply the more rigorous "strict scrutiny" test, under which a challenged state action will be upheld only if it advances a compelling state interest and is narrowly tailored to meet that interest. Strict scrutiny has generally been applied to two types of equal protection claims: (1) where the challenged action or legislation involves a "suspect" classification, i.e. a classification based on race, alienage, or national origin, see, e.g., Graham v. Richardson, 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534 (1971); Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194 (1944); and (2) where the challenged action infringes on fundamental constitutional rights, such as the right to travel or rights protected by the First Amendment, see, e.g., Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Police Dept. of Chicago v. Mosley, 408 U.S. 92, 101, 92 S.Ct. 2286, 2293, 33 L.Ed.2d 212 (1972). Strict scrutiny is applied in such cases because classifications that are based on race or that infringe on fundamental constitutional rights, are presumptively invalid and will not often be justified by a legitimate state interest.
 
 
 15
 The plaintiffs concede that their case does not involve race, alienage or national origin, but they contend that strict scrutiny is required because the state has infringed upon their fundamental right to vote. We disagree. That a law or state action imposes some burden on the right to vote does not make it subject to strict scrutiny. Burdick v. Takushi, --- U.S. ----, ----, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992); see also Rodriguez v. Popular Democratic Party, 457 U.S. 1, 9, 102 S.Ct. 2194, 2199, 72 L.Ed.2d 628 (1982) ("[T]he right to vote, per se, is not a constitutionally protected right." (citations omitted)).[9] Accordingly, the Supreme Court has held that the appropriate level of scrutiny into the propriety of a state law or action regulating elections "depends upon the extent to which the challenged regulation burdens First and Fourteenth Amendment rights." Burdick, --- U.S. at ----, 112 S.Ct. at 2063. Plaintiffs have not articulated what fundamental constitutionally protected right has been infringed that would merit application of strict scrutiny. Nor, as we will explain, can we discern how the absence of a "core constituency" of citizens who elected Senator Pecora in their district infringes plaintiffs' fundamental constitutional rights.
 
 
 16
 Strict scrutiny has been applied to legislation that restricted access to the ballot based on lack of wealth or lack of property. See Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (poll tax subject to strict scrutiny and struck down under Equal Protection Clause); Kramer v. Union Free School Dist., 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (state statute limiting franchise in certain school districts to owners or lessees of taxable realty subject to strict scrutiny and struck down under Equal Protection Clause). The Court applied strict scrutiny in these cases because the legislation permanently denied access to vote to a discrete group of voters based on a personal characteristic--the lack of wealth or property--which, "like race, creed, or color, is not germane to one's ability to participate in the electoral process. Lines drawn on the basis of wealth or property, like those of race, are traditionally disfavored." Harper, 383 U.S. at 668, 86 S.Ct. at 1082 (citation omitted); see also Kramer, 395 U.S. at 626-27, 89 S.Ct. at 1889 ("Statutes granting the franchise to residents on a selective basis always pose the danger of denying some citizens any effective voice in governmental affairs" and require close scrutiny.).
 
 
 17
 In contrast to the statutes reviewed in Harper and Kramer, the two-year "disenfranchisement" suffered by the plaintiffs here as a result of the 1991 reapportionment and Senator Pecora's representation of their district was not targeted at a discrete group of voters based on some personal characteristic, such as wealth or property ownership. Nor has it precluded plaintiffs from voting in any regularly scheduled senate election, for they will have equal access to the ballot in the next regularly scheduled state senate election in 1994.
 
 
 18
 Courts that have addressed equal protection claims brought by voters who were temporarily disenfranchised after a reapportionment have consistently applied rational-basis review. See, e.g., Republican Party of Oregon v. Keisling, 959 F.2d 144 (9th Cir.1992); Mader v. Crowell, 498 F.Supp. 226, 230-31 (M.D.Tenn.1980); Pate v. El Paso County, 337 F.Supp. 95 (W.D.Tex.) (three-judge court), aff'd without opinion, 400 U.S. 806, 91 S.Ct. 55, 27 L.Ed.2d 38 (1970). Similarly, equal protection challenges to statutes prescribing the manner in which legislative vacancies are filled have been evaluated under the rational-basis test. See Rodriguez v. Popular Democratic Party, 457 U.S. 1, 12, 102 S.Ct. 2194, 2201, 72 L.Ed.2d 628 (1982) (applying rational-basis review to state's choice of manner in which to fill legislative vacancies); Trinsey v. Pennsylvania, 941 F.2d 224, 234-36 (3d Cir.) (same), cert. denied, --- U.S. ----, 112 S.Ct. 658, 116 L.Ed.2d 750 (1991).
 
 
 19
 Plaintiffs argue, however, that the Supreme Court's decision in Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), where the Court subjected a durational residency requirement for the right to vote to strict scrutiny and found it violated the Equal Protection Clause, supports the application of strict scrutiny in this case. We disagree. Unlike the state action at issue here, and much like the challenged statutes in Harper and Kramer, the statute in Dunn carved out a discrete class of otherwise qualified voters and restricted their right to vote in regularly scheduled elections simply because they had not resided within the state for a particular length of time. Here, as we have stated, plaintiffs have not been denied their right to vote in any regularly scheduled state senate election. They were able to vote in the regularly scheduled pre-reapportionment senate elections in their old districts, and they will be able to vote in the next regularly scheduled general election for their new district in the fall of 1994. Moreover, the Court in Dunn applied strict scrutiny not only because the statute denied access to the ballot to a discrete group of otherwise qualified voters, but also because it directly burdened citizens' fundamental constitutional right to travel from state to state. See Dunn, 405 U.S. at 338-42, 92 S.Ct. at 1001-03. No such burden on the right to travel is involved here.
 
 
 20
 In sum, we agree with the district court that the 1991 Reapportionment Plan and the consequent "assignment" of Senator Pecora to represent the new 44th district for the remainder of his term--state actions that plaintiffs claim have discriminatorily affected their right to vote and/or to be represented in the state senate--are subject only to rational-basis review.[10]
 
 B.
 
 21
 As the Supreme Court recently emphasized, rational-basis review under the Equal Protection Clause "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." FCC v. Beach Communications, Inc., --- U.S. ----, ----, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993); see also Heller v. Doe, --- U.S. ----, ----, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993) (citing Beach ). A legislative classification that does not affect a suspect category or infringe on a fundamental constitutional right "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Beach, --- U.S. at ----, 113 S.Ct. at 2101 (citations omitted). The state decision-makers need not actually articulate the purpose or rationale supporting the classification; nor does the state have any obligation to produce evidence to sustain the rationality of its decision. See Heller, --- U.S. at ----, 113 S.Ct. at 2643. In short, a classification subject to rational-basis review "is accorded a strong presumption of validity." Id. at ----, 113 S.Ct. at 2642.
 
 
 22
 Keeping in mind the high degree of deference we must afford the state decisions under review, we proceed to determine whether they lack a rational basis.
 
 C.
 
 23
 Numerous courts have concluded that temporary disenfranchisement resulting from the combined effect of reapportionment and a staggered election system meets the rational-basis test and therefore does not violate the Equal Protection Clause. See, e.g., Republican Party of Oregon v. Keisling, 959 F.2d 144 (9th Cir.1992) (combination of reapportionment plan and staggered election system for state senators that caused some citizens to wait six years to vote for senator did not violate equal protection clause); Mader v. Crowell, 498 F.Supp. 226 (M.D.Tenn.1980) (that some Tennessee voters for state senate had been moved from even-numbered district to odd-numbered district so that, under a staggered election plan, they would not vote for senator for another two years, did not render the plan unconstitutional); Ferrell v. Oklahoma, 339 F.Supp. 73, 82 (W.D.Okla.1972) (three-judge court) ("It is impossible, where Senate district boundaries are changed, to avoid having some voters represented by a Senator for whom they had no opportunity to support or oppose."), aff'd sub nom., Ferrell v. Hall, 406 U.S. 939, 92 S.Ct. 2045, 32 L.Ed.2d 328 (1972); Carr v. Brazoria County, 341 F.Supp. 155 (S.D.Tex.1972) (postponement of franchise resulting from redistricting and staggered elections for precinct offices did not violate Equal Protection or Due Process Clauses); Pate v. El Paso County, 337 F.Supp. 95 (W.D.Tx.) (three-judge court) (redistricting combined with provision in Texas Constitution establishing staggered terms for county commissioners did not unconstitutionally restrict right to vote), aff'd without opinion, 400 U.S. 806, 91 S.Ct. 55, 27 L.Ed.2d 38 (1970).
 
 
 24
 Plaintiffs do not dispute the outcome of these cases, and they concede that over one million citizens in Pennsylvania who reside outside of the new 44th district have been shifted into new even-numbered districts so that they too will be represented for nearly two years by a senator in whose election they did not participate. Plaintiffs recognize that such temporary disenfranchisement is inevitable, at least to some degree, whenever a reapportionment is combined with a staggered system of elections.
 
 
 25
 Plaintiffs contend, however, that their situation is significantly different than that of the other shifted voters because there are no voters in the new 44th district who had the opportunity to vote for Senator Pecora (except, of course, for Senator Pecora himself, and any other voters who, like him, may have moved across the state from within the area comprising the old 44th district to the area comprising the new 44th district). They argue that, although citizens may be reassigned to districts represented by senators in whose election they did not participate, an entire district cannot constitutionally be "assigned" a senator in a state, such as Pennsylvania, which does not allow for appointment of senators, but instead requires special elections to fill senate vacancies. See Pa. Const. Art. II, Sec. 2 ("Whenever a vacancy shall occur in either House, the presiding officer thereof shall issue a writ of election to fill such vacancy for the remainder of the term."). In short, plaintiffs assert that temporary or marginal disenfranchisement is constitutionally permissible only where a "core constituency" of voters who elected the senator representing a newly reapportioned district remains.
 
 
 26
 While the plaintiffs' argument may have some appeal, it has no constitutional basis. Plaintiffs claim that their right to vote for a state senator under Pennsylvania law has been infringed because they have been "assigned" a senator who was not elected by their district, or any significant portion of it. But the right they seek to protect--their right to vote on an equal basis with other Pennsylvania citizens--is an individual right. See Reynolds v. Sims, 377 U.S. at 561, 84 S.Ct. at 1381 (The right to vote is "individual and personal in nature."); United States v. Bathgate, 246 U.S. 220, 227, 38 S.Ct. 269, 271, 62 L.Ed. 676 (1917) (same). To the extent that a voter in the new 44th district has been temporarily disenfranchised after the reapportionment, he or she is in the same situation as any other temporarily disenfranchised voter in the state, regardless of whether all or only some of his or her neighbors within the same senatorial district are similarly disenfranchised. In short, we do not see how the plaintiffs have been significantly discriminated against as a result of the absence of a "core constituency" of neighbors who participated in Senator Pecora's election.
 
 
 27
 Implicit in the plaintiffs' argument is their contention that they have significantly unequal representation in the state senate because Senator Pecora does not represent their interests in the same way as senators in districts where some "core constituency" of voters remains. We question the validity of this proposition. Although Senator Pecora may not be the best person to represent the new 44th District, he nonetheless has incentives to represent his current constituency similar to those of many other incumbent senators in even-numbered senatorial districts. Although reapportionment has altered all of these senators' constituencies, their interest in re-election and in doing their jobs well, i.e. representing their districts, remains. At all events, we fail to see how the presence of a "core constituency" of voters who elected Senator Pecora will necessarily improve Senator Pecora's representation of these plaintiffs. There is no reason to believe that the interests of a "core constituency" would coincide with the interests of voters who were shifted into a district as a result of reapportionment.[11]
 
 
 28
 Plaintiffs' attempt to distinguish their situation from that of the other Pennsylvania voters who have been shifted into other even-numbered districts is based largely on their contention that, unlike in all other districts, their senator has been appointed, rather than elected, as required by Pennsylvania law. There are two problems with this argument. First, the Pennsylvania Supreme Court, which is the final arbiter of Pennsylvania law, held that, with the approval of the Pennsylvania Senate, Senator Pecora would be the proper representative of the new 44th district for the remaining two years of his term. See 1991 Pennsylvania Legislative Reapportionment Comm'n, 609 A.2d at 140-41. Thus, the plaintiffs' suggestion that the "assignment" of Senator Pecora to represent their district does not comport with Pennsylvania law is wrong.
 
 
 29
 Second, the United States Supreme Court has held that appointment of a state senator to fill a vacancy during the remainder of a vacant senate term does not violate the Equal Protection Clause or any other constitutional right. Rodriguez v. Popular Democratic Party, 457 U.S. 1, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982). The plaintiffs in Rodriguez challenged a Puerto Rico law that vested in a political party the power to fill an interim vacancy in the Puerto Rico Legislature. They argued that qualified voters have a constitutional right to elect their representatives and that vacancies must therefore be filled by special election. Rejecting the claim, the Court explained that the Constitution does not confer an unconditional right to vote, although, when a state provides that its representatives be elected, citizens have a constitutionally protected right under the Equal Protection Clause to participate in elections on an equal basis with other citizens. Rodriguez, 457 U.S. at 10, 102 S.Ct. at 2200.
 
 
 30
 The Court in Rodriguez found no equal protection violation, reasoning that the Puerto Rico statute at issue did not
 
 
 31
 restrict access to the electoral process or afford unequal treatment to different classes of voters or political parties. All qualified voters have an equal opportunity to select a district representative in the general election; and the interim appointment provision applies uniformly to all legislative vacancies, whenever they arise.
 
 
 32
 Id.; see also Lynch v. Illinois State Bd. of Elections, 682 F.2d 93 (7th Cir.1982) (holding that Illinois municipal code provision allowing the filling of vacancies to elected municipal offices by appointment for period up to 28 months before next scheduled election was not unconstitutional because states have legitimate interest in insuring that governmental processes are not disrupted by vacancies and wide latitude in devising methods to fill such vacancies); cf. Valenti v. Rockefeller, 393 U.S. 405, 89 S.Ct. 689, 21 L.Ed.2d 635 (1969) (upholding authority of Governor of New York to appoint person to fill vacancy in United States Senate until next regularly scheduled congressional election against challenge brought under the Seventeenth Amendment); Trinsey v. Pennsylvania, 941 F.2d 224 (3d Cir.) (upholding Pennsylvania statute allowing appointment to fill vacant U.S. Senate seat against challenge under Seventeenth Amendment and Equal Protection Clause), cert. denied, --- U.S. ----, 112 S.Ct. 658, 116 L.Ed.2d 750 (1991).
 
 
 33
 Whether by statute or by the unique combination of the decisions of the Pennsylvania Supreme Court and the qualification vote of the Pennsylvania Senate, the state law in both Rodriguez and this case permit the designation of a representative unelected by the specific district to represent the district until the next regularly scheduled general election. As in Rodriguez, the assignment of Senator Pecora to the new 44th district did not restrict plaintiffs' access to the electoral process, for, like all other Pennsylvania citizens, the voters in the new 44th district will be able to vote in the next regularly scheduled general election for senators in 1994.
 
 
 34
 Against this background, we cannot say that the combination of the 1991 Reapportionment Plan, the seating of Senator Pecora as representative of the new 44th district, and the staggered election system for Pennsylvania senators, lacks a rational basis. As we have noted, there was a drastic shift in population from the western to the eastern part of Pennsylvania, which the state was constitutionally required to accommodate through reapportionment, see Reynolds v. Sims, 377 U.S. at 568, 84 S.Ct. at 1385. Of course, there were numerous ways in which the districts could have been redrawn and renumbered. As plaintiffs contend, the Commission need not have drawn up an entirely new district in the eastern part of the state, but could have shifted the districts incrementally from west to east to account for the increased population in the east. Or, the Commission could have assigned the single newly created district an odd number (so that there would have been a general election for state senator in the fall of 1992 rather than 1994) and one of the odd-numbered districts an even number. But no matter how the reapportionment was done, there would have been a significant number of voters shifted into even-numbered districts who, like plaintiffs, would be represented by a senator for over two years whom they did not elect.
 
 
 35
 As a result of the Commission's decision to assign number 44 to the newly created eastern Pennsylvania district, the approximately 239,000 residents of that district are represented for two years by a senator in whose election they had not participated. Moreover, approximately 114,600 residents of that district (or 47.9%) have to wait six years to participate in a senatorial election since they were shifted from odd-numbered districts into an even-numbered district. See supra n. 4. Had the Commission decided instead to assign the number 44 to the district in western Pennsylvania that is now designated number 43, approximately 172,400 residents in that district would have been represented for two years by a senator (Senator Pecora) in whose election they did not participate, and approximately 172,400 residents (or 72% of the district) would not have had the opportunity to participate in a senatorial election for six years since they would have been shifted from an odd-numbered to an even-numbered district. Thus, this alternative would have required a significantly larger number of persons to wait six years, instead of the normal four, for an opportunity to participate in a senate election.
 
 
 36
 At all events, it is not our place to determine whether the Commission's decisions were the best decisions or even whether they were good ones. A classification does not fail rational-basis review simply because it "is not made with mathematical nicety or because in practice it results in some inequality." Dandridge, 397 U.S. at 485, 90 S.Ct. at 1161 (citing Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911)); see also Heller, --- U.S. at ----, 113 S.Ct. at 2643. Heeding the Supreme Court's repeated caveat that "reapportionment is primarily the duty and responsibility of the State ... rather than of a federal court," Voinovich, --- U.S. at ----, 113 S.Ct. at 1157, we cannot say that the Commission's decisions to draw an entirely new district in the eastern part of the state, to dissolve a district in the western part of the state, and to assign the new district the number 44, in order to accommodate a drastic population shift, was not rational.
 
 
 37
 As for the Pennsylvania Supreme Court's decision that Senator Pecora could be lawfully seated to represent new District 44 for the remainder of his term, and the Senate's subsequent vote so to seat him, rather than to hold a special election, we cannot say that these state actions lack a rational basis either. The state has a legitimate interest in not ousting a senator in the middle of the four-year term which he was elected to serve. Moreover, as the Supreme Court recognized in Rodriguez, the state has a legitimate interest in avoiding the expense and inconvenience of a special election. See Rodriguez, 457 U.S. at 12, 102 S.Ct. at 2201.
 
 
 38
 We are not unmindful of the strong intimation in the plaintiffs' papers that political partisanship was a driving force behind the unusual chain of events at issue here.[12] But if that is so, it only vindicates the rationale behind the deferential standard of review here, i.e., that federal courts generally should refrain from interfering in political disputes arising out of state reapportionment.[13] While we may not find that any or all of the state decisions that culminated in the seating of Senator Pecora to represent the new 44th district were the best or fairest decisions, we nonetheless find that they are supported by a rational basis. The judgment of the district court will therefore be affirmed.[14]
 
 
 
 [1]
 Reapportionment is governed by Article II, Sec. 17 of the Pennsylvania Constitution, which provides in part:
 (a) In each year following that in which the Federal decennial census is officially reported as required by Federal law, a Legislative Reapportionment Commission shall be constituted for the purpose of reapportioning the Commonwealth. The commission shall act by a majority of its entire membership.
 
 
 [2]
 Article II, Sec. 17 of the Pennsylvania Constitution provides, in part:
 (d) Any aggrieved person may file an appeal from the final plan directly to the Supreme Court within thirty days after the filing thereof. If the appellant establishes that the final plan is contrary to law, the Supreme Court shall issue an order remanding the plan to the commission and directing the commission to reapportion the Commonwealth in a manner not inconsistent with such order.
 (e) When the Supreme Court has finally decided an appeal or when the last day for filing an appeal has passed with no appeal taken, the reapportionment plan shall have the force of law....
 
 
 [3]
 The new 44th district is composed of parts of Berks, Chester, Lehigh, and Montgomery Counties
 
 
 [4]
 Additionally, any voter who was reassigned from an odd-numbered district to an even-numbered district would lose the opportunity he or she otherwise would have had to participate in a senate election in 1992 and would have to wait an extra two years to vote for a state senator
 
 
 [5]
 Senator Pecora, who was formerly a Republican but switched parties as these events unfolded, participated in the vote to seat himself. The initial vote resulted in a tie, reflecting the equal number of Democrats and Republicans in the Senate, which was then broken by the vote of the Lieutenant Governor, a Democrat, in favor of seating Senator Pecora. Thus, with Senator Pecora seated, the balance between Democrats and Republicans remained, and the Democrats, by virtue of the tie-breaking vote of the Lieutenant Governor, were in control of the Senate
 
 
 [6]
 Under the Pennsylvania Constitution, Art. II, Sec. 5, senators must have been inhabitants of their respective districts for at least one year prior to their election. As the Pennsylvania Supreme Court noted in In re 1991 Pennsylvania Legislative Reapportionment Comm'n, 609 A.2d at 139 n. 7, the one-year residency requirement would likely have to be waived after the reapportionment since, with the redrawing of 49 out of 50 districts, no representative would have lived within a newly drawn district for one year. But the court held that under Pa. Const., Art. II, Sec. 9, these issues of qualification were ultimately for the Senate to decide. Id. (citing In re Jones, 505 Pa. 50, 476 A.2d 1287 (1984))
 
 
 [7]
 The members of the Commission included: Chairman Robert Cindrich, State Representatives John Perzel and Allen Kukovich, State Senators Joseph Loeper and Robert Mellow, and recently substituted ex officio members of the Commission, who were, as of the date of the filing of the complaint, State Senators Robert Jubelirer and William Lincoln
 Governor Casey was also named as a defendant in the complaint. However, pursuant to Fed.R.Civ.P. 41, the parties voluntarily dismissed the Governor. The parties also dropped all claims against Mitchell and Boehm in their personal capacities.
 
 
 [8]
 Throughout the Commission's deliberations over the 1991 Reapportionment Plan, Senator Loeper opposed the version of the plan that was finally adopted by a majority of the Commission. Senator Jubelirer was not a member of the Commission at that time
 
 
 [9]
 States retain broad discretion to regulate their own elections, Burdick, --- U.S. at ----, 112 S.Ct. at 2063, and to determine the apportionment of their own legislative districts, see Growe v. Emison, --- U.S. ----, ----, 113 S.Ct. 1075, 1081, 122 L.Ed.2d 388 (1993) ("[R]eapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court."); see also Voinovich v. Quilter, --- U.S. ----, ---- - ----, 113 S.Ct. 1149, 1156-57, 122 L.Ed.2d 500 (1993) (same)
 
 
 [10]
 Plaintiffs also argue that if we decide not to apply strict scrutiny, we should apply an intermediate level of scrutiny of the type applied in ballot access cases such as Burdick v. Takushi, --- U.S. ----, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (reviewing statutory prohibition on write-in voting); Anderson v. Celebrezze, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (reviewing statutory requirement that independent candidates for President of the United States file nominating petitions over six months prior to general elections), and Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (reviewing statutory requirement that candidates for local office pay filing fees as high as $8,000). Each of these cases, however, involved laws that restricted voters' range of choices at the ballot box, restrictions which the Court found burdened voters' First Amendment Rights. No such restriction on plaintiffs' First Amendment rights is involved here. See Keisling, 959 F.2d at 145 (distinguishing the rights at issue in Anderson from plaintiffs' claim against temporary disenfranchisement after reapportionment, which the court found did not infringe First Amendment rights)
 
 
 [11]
 When asked at oral argument what minimum percentage of voters would constitute a "core constituency" sufficient to pass constitutional muster under their theory, plaintiffs were unable to offer a definition. Rather, they argued that wherever a court were to draw the line, the 0% "core constituency" that exists in the new 44th district would clearly fall below it. Because we find no merit to plaintiffs' proposed "core constituency" doctrine, we need not engage in any arbitrary line-drawing. We note, however, that plaintiffs' conceded inability to define their concept of "core constituency" supports our conclusion that there is no significant difference between the position of the plaintiffs and that of the over one million other voters shifted into other even-numbered districts that contain some percentage of voters who participated in the incumbent senator's election in 1990
 
 
 [12]
 Plaintiffs were free to challenge the reapportionment plan by bringing a claim of political gerrymandering under the Equal Protection Clause, see Davis v. Bandemer, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986), but did not do so
 
 
 [13]
 Indeed, application of a more exacting standard would interject the federal courts directly into the sinews of redistricting decisions
 
 
 [14]
 Because we have found that the plaintiffs' constitutional claims are without merit, we need not address the additional arguments raised by defendants, including the defendants' contention that plaintiffs failed to join the Lieutenant Governor as an indispensable party under Fed.R.Civ.Pro. 19(a)(2)(i); that the plaintiffs' claims are barred by laches; that the members of the Commission are entitled to absolute immunity from suit under the Pennsylvania Constitution's Speech or Debate Clause, Art. II, Sec. 15; and that the members of the Commission are entitled to qualified immunity from the damages claim under Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)