# United States Court of Appeals for the Fifth Circuit

---

No. 25-11055

---

Winnie Jackson; Jarrett "Jay" Jackson; Celina Vasquez; Duane Braxton; Nadia Bhular; Amjad Bhular; Cheryl Mills Smith; Richard Canada,

*Plaintiffs—Appellants*,

*versus*

Tarrant County, Texas; Tarrant County Commissioners Court; Tim O'Hare, *in his official capacity as Tarrant County Judge*,

*Defendants—Appellees*.

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:25-CV-587

---

Before Barksdale, Willett, and Duncan, *Circuit Judges*.

Don R. Willett, *Circuit Judge*:

Administering free and fair elections requires someone to set the rules of the electoral road. Under our Constitution, that duty rests with the States and their political subdivisions, which enjoy "considerable discretion in

No. 25-11055

establishing rules for their own elections."[1] That discretion reaches its height in the redistricting process, for redistricting—like the broader electoral system—"is primarily the duty and responsibility of the State through its legislature or other body."[2]

Even so, that authority has limits. The Constitution itself draws them: the Fourteenth and Fifteenth Amendments forbid racial discrimination in the conduct of elections. Within those bounds, however, the power of States and localities to fix district lines is broad—and ours is narrow. Unless a plaintiff proves racial discrimination, federal courts must stay their hand, mindful that "[t]he task of redistricting is best left to . . . legislatures, elected by the people and as capable as the courts, if not more so, in balancing the myriad factors and traditions in legitimate districting policies."[3]

Because judicial intervention in this realm is fraught, our review, while exacting, must also be restrained. This case tests that balance.

\*　　\*　　\*

Here, Tarrant County chose to redraw the precinct lines used to elect its County Commissioners—and to do so mid-cycle. The Challengers, a group of voters reassigned from one district to another, contend that the County Commissioners Court redrew the lines to harm racial minorities. They further argue that, even if partisanship rather than race drove the decision, the County's staggered elections justify our intervention despite the general rule against policing partisan maps. We hold that the facts do not

---

[1] *Vote.org v. Callanen*, 89 F.4th 459, 480 (5th Cir. 2023).

[2] *See Chapman v. Meier*, 420 U.S. 1, 27 (1975).

[3] *Abrams v. Johnson*, 521 U.S. 74, 101 (1997).

2

No. 25-11055

support the Challengers' first argument, and the law does not support their second.

Accordingly, we AFFIRM the district court's denial of a preliminary injunction.

## I.    Background

Under the Texas Constitution, each County Commissioners Court acts as the county's "principal governing body"—its nerve center of local administration.[4] The Commissioners Court consists of four County Commissioners and a County Judge.[5] Each Commissioner is elected by the voters of one of the four "commissioners precincts,"[6] serving four-year staggered terms so that elections occur in two precincts every even-numbered year.[7] The County Judge serves the same four-year term but is elected countywide.[8] In addition to its other "legislative, executive, administrative, and judicial functions,"[9] the Commissioners Court holds a

---

[4] *Comm'rs Ct. of Titus Cnty. v. Agan*, 940 S.W.2d 77, 79 (Tex. 1997); *see* TEX. CONST. art. 5, § 18(b) ("[T]he County Commissioners Court . . . shall exercise such powers and jurisdiction over all county business, as is conferred by this Constitution and the laws of the State, or as may be hereafter prescribed.").

[5] TEX. CONST. art. 5, § 18(b).

[6] *Id.*

[7] *See id.* (providing that a County Commissioner "shall hold his office for four years and until his successor shall be elected and qualified"); *Fashing v. El Paso Cnty. Democratic Exec. Comm.*, 534 S.W.2d 886, 888–90 (Tex. 1976) (describing the adoption of a staggered election system).

[8] TEX. CONST. art. 5, § 15.

[9] *Agan*, 940 S.W.2d at 79.

3

power both fundamental and fateful: the constitutional authority to draw—and redraw—the four commissioners precincts.[10]

"The Texas Constitution does not require counties to reapportion commissioners' precincts at any particular time, but only 'from time to time, for the convenience of the people.'"[11] To comply with the federal "one person, one vote" principle announced in *Gray v. Sanders*,[12] states and their political subdivisions must generally redistrict upon release of the decennial census "to account for any changes or shifts in population."[13] In 2021, the Tarrant County's Commissioners Court—home to Fort Worth and several neighboring cities—retained a Texas-based law firm to assist with the redistricting process. The same firm had guided the County's redistricting efforts after the 1990, 2000, and 2010 censuses.

The results from the 2020 census showed that, although Tarrant County's non-Hispanic white voting-age population had decreased by about 30,000 since the 2010 census, its overall voting-age population had increased by more than 300,000. That growth, however, was distributed roughly evenly

---

[10] Article 5, Section 18(b) of the Texas Constitution requires commissioners precincts to be created "in the manner provided for justice of the peace and constable precincts." TEX. CONST. art. 5, § 18(b). Section 18(a), in turn, provides that "[a] division or designation" of justice of the peace and constable precincts "shall be made by the Commissioners Court." TEX. CONST. art. 5, § 18(a).

[11] *Abbott v. Mexican Am. Legis. Caucus, Tex. House of Representatives*, 647 S.W.3d 681, 707 (Tex. 2022) (HECHT, C.J., dissenting) (quoting TEX. CONST. art. 5, § 18(a)).

[12] 372 U.S. 368, 381 (1963) ("The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote.").

[13] *Georgia v. Ashcroft*, 539 U.S. 461, 488 n.2 (2003), *superseded by statute on other grounds*, Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Pub. L. 109-246, 120 Stat. 577, *as recognized in*, *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 276 (2015).

No. 25-11055

across the County's four commissioners precincts. According to the law firm's Initial Assessment, continuing to use the existing precinct boundaries would result in a maximum population deviation—defined as "the sum of the percentage deviations from perfect population equality of the most- and least-populated districts"[14]—of just 1.97%—well below the 10% threshold that "presumptively complies with the one-person, one-vote rule."[15] Accordingly, although the Commissioners Court unanimously adopted a set of redistricting criteria, it ultimately voted 4–1 to retain the same map adopted after the 2010 census. In doing so, the Court rejected an alternative map that proponents claimed would better "account[ ] for the growth of minority communities" within the County.

On April 2, 2025, by a narrow 3–2 majority, the Commissioners Court approved a legal-services contract with the Virginia-based Public Interest Law Foundation (PILF) to manage a mid-decade redistricting in advance of the 2026 election. Unlike its predecessor, PILF did not recommend that the Commissioners Court adopt criteria to guide the redistricting process. The County first posted five potential maps on its website and held public hearings in each precinct. After the hearings—and just five days before the Commissioners Court was scheduled to vote on a new map—two additional maps, Maps 6 and 7, were posted on the County's website. At a Commissioners Court meeting on June 3, 2025, one commissioner moved to adopt Map 7, while another moved to postpone the vote to allow the public more time to review the proposal. The motion to postpone failed, 3–2, and Map 7 was adopted by that same narrow margin.

_____

[14] *Evenwel v. Abbott*, 578 U.S. 54, 60 n.2 (2016).

[15] *Id.* at 60; *see Brown v. Thomson*, 462 U.S. 835, 842 (1983) ("Our decisions have established, as a general matter, that an apportionment plan with a maximum deviation under 10% falls within this category of minor deviations.").

No. 25-11055

Under the old map, two precincts were majority Republican and two were majority Democrat. Under Map 7, by contrast, three precincts are majority Republican and only one is majority Democrat. In addition, while the previous map had two majority-minority districts and two majority-white districts, Map 7 alters that mix to one majority-minority district and three majority-white districts.

Because County Commissioners serve staggered terms, the redistricting reshuffled voters among precincts with different election cycles. Some voters who previously resided in precincts scheduled to elect a County Commissioner in 2026 were reassigned to precincts that will not hold such elections until 2028, while others moved in the opposite direction. In total, approximately 9.8% of Tarrant County's voting-age population was shifted from precincts slated for 2026 elections to those that will not hold Commissioner elections until 2028.

Democratic voters are disproportionately represented among those moved to precincts that will not vote until 2028: Although Vice President Kamala Harris recorded 46.7% of the Tarrant County vote in the 2024 presidential election, Harris voters make up 62.7% of those transferred to a precinct that will not hold a County Commissioner election until 2028. Comparable patterns emerge using results from the 2024 U.S. Senate race or the 2022 gubernatorial election instead.

The voters shifted to precincts without a 2026 election also include disproportionate shares of Tarrant County's black and Latino voting-age populations. Although black and Latino Americans comprise 17.9% and 26.3% of Tarrant County's voting-age population, they represent 31.2% and 31.9%, respectively, of those transferred to precincts not holding a County Commissioner election until 2028.

No. 25-11055

Plaintiffs Winnie Jackson, Jarrett "Jay" Jackson, Celina Vasquez, Duane Braxton, Nadia Bhular, Amjad Bhular, Cheryl Mills-Smith, and Richard Canada (collectively, "the Challengers") sued to prevent Map 7's use in the 2026 election. They named Tarrant County, the Tarrant County Commissioners Court, and County Judge Tim O'Hare, in his official capacity, (collectively, "the County") as defendants. Plaintiffs Winnie Jackson, Jay Jackson, Braxton, and Mills-Smith are black; Vasquez and Nadia Bhular are Latina; Amjad Bhular is Southeast Asian; and Canada is white.

Under the prior map, each Challenger resided in a precinct scheduled to elect a County Commissioner in 2026. Under Map 7, however, all have been reassigned to precincts that will not hold such elections until 2028.

In the district court, the Challengers alleged that Map 7 violated § 2 of the Voting Rights Act and the First, Fourteenth, and Fifteenth Amendments. The Challengers moved for a preliminary injunction, and the County moved to dismiss on jurisdictional and Rule 12(b)(6) grounds. The district court granted the County's motion in part—dismissing the Challengers' First Amendment claims—but otherwise denied both motions.

The Challengers appealed the denial of the preliminary injunction. In light of the fast-approaching candidate-filing period, which begins on November 8, 2025, a motions panel granted the Challengers' request to expedite the appeal.

## II.    STANDARD OF REVIEW

"We review the district court's grant of [a] preliminary injunction for abuse of discretion, reviewing underlying factual findings for clear error and legal conclusions de novo."[16] The framework governing preliminary

_____

[16] *Harrison v. Young*, 48 F.4th 331, 339 (5th Cir. 2022).

No. 25-11055

injunctions "is long-standing and familiar."[17] Plaintiffs seeking such relief must show four things: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm if an injunction is not granted; (3) that the balance of equities tips in their favor; and (4) that an injunction would serve the public interest.[18] "The first factor—likelihood of success on the merits—is 'the most important.'"[19]

## III. Discussion

On appeal, the Challengers raise three arguments: (1) that Map 7 discriminates on the basis of viewpoint in violation of the First and Fourteenth Amendments; (2) that Map 7 discriminates on the basis of race in violation of the Fourteenth and Fifteenth Amendments; and (3) that the County's mid-cycle redistricting unlawfully disenfranchises certain Tarrant County residents without adequate justification. We take each in turn.

### A. Viewpoint Discrimination

First, the Challengers argue that the Commissioners Court drew the new district maps based on residents' partisan affiliations, intending to diminish the political strength of Democratic voters. They contend this amounts to unconstitutional viewpoint discrimination.[20] The County responds that this claim merely repackages a partisan-gerrymandering

---

[17] *United States v. Abbott*, 110 F.4th 700, 706 (5th Cir. 2024).

[18] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[19] *Abbott*, 110 F.4th at 706 (quoting *Mock v. Garland*, 75 F.4th 563, 587 n.60 (5th Cir. 2023)).

[20] *Rosenberger v. Rector of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("Discrimination against speech because of its message is presumed to be unconstitutional." (citation omitted)).

theory—one foreclosed to the federal courts under *Rucho v. Common Cause*.[21] The district court agreed with the County, and so do we.

Article III, which "vest[s]" federal courts with "[t]he judicial power of the United States,"[22] at once empowers and "confines" that power to certain categories of "Cases" and "Controversies."[23] That limitation helps "ensur[e] that the Federal Judiciary respects 'the proper—and properly limited—role of the courts in a democratic society.'"[24] One aspect of the case-or-controversy requirement is the so-called "political question doctrine."[25]

Although "it is emphatically the province and duty of the judicial department to say what the law is," "[s]ometimes . . . the law is that the judicial department has no business entertaining the claim of unlawfulness—because the question is entrusted to one of the political branches or involves no judicially enforceable rights."[26] The political-question doctrine embodies that principle. A federal court's "declination of jurisdiction under the doctrine" is not abdication but acknowledgement—a recognition that courts

---

[21] 588 U.S. 684 (2019).

[22] U.S. Const. art. III, § 1.

[23] *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024); *see* U.S. Const. art. III, § 2.

[24] *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)).

[25] *See Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 948 (5th Cir. 2011) ("[T]he concept of justiciability, as embodied in the political question doctrine, expresses the jurisdictional limitations imposed upon federal courts by the case or controversy requirement of Article III." (cleaned up)); *see also Massachusetts v. EPA*, 549 U.S. 497, 516 (2007) ("It is therefore familiar learning that no justiciable 'controversy' exists when parties seek adjudication of a political question . . . .").

[26] *Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004) (plurality opinion) (cleaned up) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)).

are "incompetent to make final resolution of certain matters" which "another branch of government is both capable and better suited for resolving."[27]

In *Rucho*, the Supreme Court held that "partisan gerrymandering claims present political questions beyond the reach of the federal courts."[28] The Challengers seek to sidestep *Rucho* by characterizing their claims as ones of viewpoint-based disenfranchisement rather than viewpoint-based vote dilution. They argue *Rucho* governs only the latter. But the Challengers use of "disenfranchisement" stretches the term beyond recognition. True, they cannot vote in the 2026 County Commissioner race, in which they would have voted absent the redistricting. Yet they *will* vote in a different election—the 2028 County Commissioner race—in which they would not otherwise have participated. The tradeoff is inherent in every redistricting: some voters are shifted out of one district and into another, losing the franchise in one election while gaining it in the other.

What the Challengers' claim adds is not true disenfranchisement but rather mere vote postponement[29]—the natural and unavoidable byproduct of redistricting within a staggered electoral system. Nothing in *Rucho* suggests that its conclusion would have been different if the districts at issue held staggered (rather than simultaneous) elections. To the contrary, the Court has emphasized that *Rucho*'s rule extends broadly to all "claims that a map is

---

[27] *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

[28] 588 U.S. at 718; *see Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 21 (2024) (describing *Rucho* as "holding . . . that partisan-gerrymandering claims are not justiciable in federal court"); *Mi Familia Vota v. Abbott*, 977 F.3d 461, 466 (5th Cir. 2020) (describing *Rucho* as holding "that claims of excessive partisanship in districting are not justiciable" (citation omitted)).

[29] We borrow this terminology from *Carr v. Brazoria Cnty.*, 341 F. Supp. 155, 160 (S.D. Tex.), *aff'd* 468 F.2d 950 (5th Cir. 1972) (mem.).

unconstitutional because it was drawn to achieve a partisan end."[30] But even assuming the added element of vote postponement was sufficient to bring the Challengers' claim outside *Rucho*'s precise holding, *Rucho*'s reasoning still governs.[31]

The *Rucho* Court rested its decision on the absence of "a limited and precise standard that is judicially discernible and manageable."[32] As the Court explained, "[p]artisan gerrymandering claims have proved far more difficult to adjudicate" than malapportionment or racial gerrymandering claims for one "basic reason": "[W]hile it is illegal for a jurisdiction to depart from the one-person, one-vote rule, or to engage in racial discrimination in districting, 'a jurisdiction may engage in constitutional political gerrymandering.'"[33] Thus, "[t]he 'central problem'" in a political gerrymandering case was "not determining whether a jurisdiction has engaged in partisan gerrymandering," but rather "determining when political gerrymandering has gone too far."[34] Recognizing that "the Constitution supplies no objective measure for assessing whether a districting map treats a political party fairly," the Court concluded that the

---

[30] *Alexander*, 602 U.S. at 6.

[31] *Cf. Ramos v. Louisiana*, 590 U.S. 83, 104 (2020) (plurality opinion) ("It is usually a judicial decision's reasoning—its *ratio decidendi*—that allows it to have life and effect in the disposition of future cases." (citations omitted)).

[32] *Rucho*, 588 U.S. at 710; *see also Mi Familia Vota*, 977 F.3d at 466 ("The [*Rucho*] Court concluded that partisan gerrymandering claims constitute political questions because they lack judicially discoverable and manageable standards for resolving them." (cleaned up)).

[33] *Rucho*, 588 U.S. at 701 (quoting *Hunt v. Cromartie* (*Cromartie I*), 526 U.S. 541, 551 (1999)).

[34] *Id.* (quoting *Vieth*, 541 U.S. at 296).

question of "[h]ow much political motivation and effect is too much" is one the Constitution commits to the political process, not to the judiciary.[35]

The Challengers have not provided any reason to think that these imponderables become any more ponderable by dint of a staggered election cycle. Thus, even if *Rucho*'s precise result does not control, its reasoning clearly does. The Challengers' viewpoint-discrimination claim is nonjusticiable. Accordingly, the district court lacked jurisdiction[36] and did not err in declining to consider the viewpoint-discrimination claim as a basis for injunctive relief.[37]

## B.  Race Discrimination

We turn next to the Challengers' race-discrimination claim. As a threshold issue, we reject the County's argument that this claim, like the viewpoint-discrimination claim, presents a nonjusticiable political question. We agree with the County (and the district court), however, that the Challengers have not shown intentional race discrimination. Thus, they are not likely to succeed on the merits of this claim.

---

[35] *Id.* at 708, 716 (quoting *Vieth*, 541 U.S. at 296–97).

[36] *Id.* at 696 (noting that a political question is "beyond the courts' jurisdiction" (citation omitted)).

[37] The district court concluded that *Rucho* barred the Challengers' First Amendment claim but nevertheless purported to dismiss that claim with prejudice. Although that dismissal is not before us, we note that the political-question doctrine deprives a court of jurisdiction, *see id.* at 696 (noting that a political question is "beyond the courts' jurisdiction"). Accordingly, any dismissal under the doctrine "must be *without* prejudice to refiling in a forum of competent jurisdiction"—such as a state court. *Carver v. Atwood*, 18 F.4th 494, 498 (5th Cir. 2021) (citation omitted); *see Rucho*, 588 U.S. at 719 ("Provisions in state statutes and state constitutions can provide standards and guidance for state courts to apply."); *In re Khanoyan*, 637 S.W.3d 762, 768 n.10 (Tex. 2022) (reserving the question of "whether claims of political gerrymandering are . . . within Texas courts' subject-matter jurisdiction").

### 1. Justiciability

In *Rucho*, the Court acknowledged that its "cases have held that there is a role for the courts with respect to at least some issues that could arise from a State's drawing of congressional districts"—namely, "one-person, one-vote and racial gerrymandering."[38] That recognition, we have observed, "strongly indicates that, by contrast [to political gerrymandering claims], race discrimination . . . claims, like those asserted by the [Challengers], do not present political questions."[39] And while "a legislature may pursue partisan ends when it engages in redistricting" "as far as the Federal Constitution is concerned,"[40] "[l]aws that explicitly discriminate on the basis of race, as well as those that are race neutral on their face but are unexplainable on grounds other than race, are . . . presumptively invalid."[41] Thus, we have held that similar claims "do not present political questions."[42]

The County argues, however, that because the Commissioners Court's true motivation was political, rather than racial, *Rucho* bars the Challengers' race-discrimination claims. But *Rucho*'s reach turns on the type of discrimination alleged—the inquiry that determines whether the applicable standards are "judicially discernible and manageable"[43]—not on the defendant's preferred characterization of its motives. Where, as here, plaintiffs allege racial discrimination, but the defendants respond that their actions were merely partisan, the task of "disentangl[ing]" the two may

---

[38] *Rucho*, 588 U.S. at 699 (citations omitted).

[39] *Mi Familia Vota*, 977 F.3d at 466.

[40] *Alexander*, 602 U.S. at 6.

[41] *Rucho*, 588 U.S. at 700.

[42] *Mi Familia Vota*, 977 F.3d at 467.

[43] *See Rucho*, 588 U.S. at 710.

prove difficult.[44] Yet the applicable standards remain "[w]ell-established."[45] Thus, the Supreme Court has treated partisan motivation as a "defense," not a jurisdictional bar.[46]

We pause briefly to note a separate justiciability issue. The Challengers argue that the Commissioners Court intentionally discriminated against black and Latino voters. However, the Challengers' declarations reveal that two of them are neither black nor Latino: one (Richard Canada) is white, while another (Amjad Bhular) is Southeast Asian. Because a plaintiff generally cannot sue to enforce the rights of others, it is not clear that these plaintiffs have standing to challenge discrimination against black and Latino voters.[47] We need not resolve that question today, however; each of the other Challengers is either black or Latina, and "[i]t is well settled that once we determine that at least one plaintiff has standing, we need not consider whether the remaining plaintiffs have standing to maintain the suit."[48]

---

[44] *See Alexander*, 602 U.S. at 9–10.

[45] *Mi Familia Vota*, 977 F.3d at 466.

[46] *See Alexander*, 602 U.S. at 9–10 (describing a "partisan-gerrymandering defense"); *id.* at 25–26 (noting that the State had "raised a partisan-gerrymandering defense" at trial); *id.* at 35 (describing "the legislature's *defense* that the districting lines were 'based on a permissible, rather than a prohibited, ground'" (emphasis added) (quoting *Cooper v. Harris*, 581 U.S. 285, 317 (2017)).

[47] *See Powers v. Ohio*, 499 U.S. 400, 410 (1991) ("In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties.").

[48] *McAllen Grace Brethren Church*, 764 F.3d 465, 471 (5th Cir. 2014) (citation omitted).

No. 25-11055

### 2. Merits

Because the district court properly exercised jurisdiction over the Challengers' race-discrimination claim, we now turn to whether it properly evaluated the Challengers' likelihood of success on the merits of that claim.

"[T]he blight of racial discrimination in voting" has a long history.[49] Equally longstanding is the recognition that such discrimination cannot coexist with democratic self-government. To bring our practice into closer alignment with our ideals, Congress proposed and the States ratified the Fifteenth Amendment, which provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged . . . on account of race, color, or previous condition of servitude."[50] The Fourteenth Amendment— adopted just a year and a half before the Fifteenth—likewise secures to every "citizen . . . a constitutionally protected right to participate in elections on an equal basis with other citizens."[51]

Applying these amendments to the redistricting context, the Supreme Court has recognized two "analytically distinct" forms of unconstitutional race discrimination.[52] The most common claim arises from the Court's 1993 decision in *Shaw v. Reno*, which explained that "redistricting legislation that is so bizarre on its face that it is 'unexplainable on grounds other than race' demands the same close scrutiny" as "other state laws that classify citizens by race."[53] "The essence of the equal protection claim recognized in *Shaw* is

---

[49] *See South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966).

[50] U.S. CONST. amend. XV, § 1.

[51] *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972).

[52] *Alexander*, 602 U.S. at 38 (quoting *Shaw v. Reno*, 509 U.S. 630, 652 (1993)).

[53] *Shaw*, 509 U.S. at 644 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)).

that the State has used race as a basis for separating voters into districts."[54] In other words, *Shaw* recognized that "the doctrine of 'separate but equal' has no place" in the redistricting process.[55]

To state a claim under *Shaw*, a plaintiff must show either that racial considerations "predominate[d]" the districting process—that is, that "race was the criterion that, in the State's view, could not be compromised"—or that race was used "as a proxy" for other considerations.[56] However, because the gravamen of a *Shaw* claim is "the sorting of persons with an intent to divide by reason of race,"[57] and this holds true "regardless of the motivations" of those doing the sorting,[58] plaintiffs raising such a claim need not show that the legislature either intended or succeeded in diluting any particular racial group's voting strength. Rather, "[t]he racial classification itself is the relevant harm in that context."[59]

The second type of claim—which we for convenience call an intentional-discrimination claim—arises when a State or political subdivision "enact[s] a particular voting scheme as a purposeful device 'to minimize or

---

[54] *Miller v. Johnson*, 515 U.S. 900, 911 (1995).

[55] *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483, 495 (1954); *see Miller*, 515 U.S. at 911 ("Just as the State may not, absent extraordinary justification, segregate citizens on the basis of race in its public parks, buses, golf courses, beaches, and schools, so did we recognize in *Shaw* that it may not separate its citizens into different voting districts on the basis of race." (citations omitted)); *cf. Students for Fair Admissions, Inc. v. President of Harvard Coll.*, 600 U.S. 181, 203 (2023) ("By 1950, the inevitable truth of the Fourteenth Amendment had thus begun to reemerge: Separate cannot be equal.").

[56] *Alexander*, 602 U.S. at 7 & n.1 (quotations omitted).

[57] *Johnson v. De Grandy*, 512 U.S. 997, 1029 (1994) (KENNEDY, J., concurring).

[58] *Shaw*, 509 U.S. at 645.

[59] *Alexander*, 602 U.S. at 38.

cancel out the voting potential of racial or ethnic minorities.'"[60] "Such theories are seldom pursued because, at least according to conventional wisdom, they are more difficult to prove than are effects-only Section 2 claims" under the Voting Rights Act.[61] When they are raised, however, they require a "different analysis."[62] Unlike a *Shaw* claim, an intentional-discrimination claim requires a plaintiff to "show that the State's districting plan 'has the purpose *and* effect' of diluting the minority vote."[63] Additionally, the purpose inquiry works differently for an intentional-discrimination claim than for a *Shaw* claim. Though a *Shaw* claim can prevail "regardless of the motivations underlying [the map's] adoption,"[64] an intentional-discrimination claim requires a legislative "purpose" of "invidiously . . . minimiz[ing] or cancel[ling] out the voting potential of racial or ethnic minorities."[65]

Importantly for our purposes, intentional discrimination claims also differ from *Shaw* claims in how they handle so-called "mixed motives." In ordinary Fourteenth Amendment cases, "[p]roof that the decision . . . was motivated in part by a racially discriminatory purpose" is sufficient to "shift[ ] to the [defendant] the burden of establishing that the same decision

---

[60] *Miller*, 515 U.S. at 911 (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 66 (1980)).

[61] *League of United Latin Am. Citizens v. Abbott* (*LULAC*), 601 F. Supp. 3d 147, 160 (W.D. Tex. 2022) (three-judge panel) (citing *Harding v. County of Dallas*, 948 F.3d 302, 313 n.47 (5th Cir. 2020)).

[62] *Shaw*, 509 U.S. at 650.

[63] *Alexander*, 602 U.S. at 39 (emphasis in original) (quoting *Shaw*, 509 U.S. at 649).

[64] *Shaw*, 509 U.S. at 645.

[65] *Bolden*, 446 U.S. at 66 (citations omitted).

would have resulted even had [race] not been considered."[66] *Shaw* and its progeny, however, require something more: "The plaintiff's burden is to show . . . that race was the *predominant* factor."[67] If race is only one factor among many, the claim fails.[68] The purpose requirement for an intentional-discrimination claim, by contrast, "is simply one aspect of the basic principle" that the Equal Protection Clause is violated "only if there is purposeful discrimination."[69] Accordingly, we apply the ordinary Fourteenth Amendment mixed-motive analysis to intentional-discrimination claims, meaning that "racial discrimination need only be one purpose, and not even a primary purpose, of an official act for a violation to occur."[70]

Here, the Challengers raise only an intentional-discrimination claim. Accordingly, the primary question is whether Map 7's adoption "was motivated in part by a racially discriminatory purpose."[71] If it was, the burden shifts to the County to prove that race was not the but-for cause of the decision.[72] In conducting that analysis, we are mindful that "determining the

---

[66] *Arlington Heights*, 429 U.S. at 270 n.21; *see also Hunter v. Underwood*, 471 U.S. 222, 232 (1985).

[67] *Miller*, 515 U.S. at 916 (emphasis added); *see also Bush v. Vera*, 517 U.S. 952, 1001–02 (1996) (THOMAS, J., concurring in the judgment) (noting this difference between the predominance standard and ordinary equal-protection analysis).

[68] *See Theriot v. Par. of Jefferson*, 185 F.3d 477, 484 n.16 (5th Cir. 1999) ("The relevance or consideration of race does not mandate a finding that race predominated.").

[69] *Bolden*, 446 U.S. at 66 (citations omitted).

[70] *Fusilier v. Landry*, 963 F.3d 447, 463 (5th Cir. 2020) (cleaned up).

[71] *Arlington Heights*, 429 U.S. at 270 n.21.

[72] *Id.*

subjective intent of legislators is a perilous enterprise."[73] "[T]he complex interplay of forces that enter a legislature's redistricting calculus" makes it especially hard in this context.[74] But "there are contexts in which determination of legislative motive *must* be undertaken."[75] And under the Supreme Court's precedents, this is one of them.

The framework set out in *Village of Arlington Heights v. Metropolitan Housing Development Corp.* guides our analysis.[76] Under *Arlington Heights*, "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."[77] Consistent with that command, we consider both direct and circumstantial indicia of intent. "Five non-exhaustive factors guide courts in determining whether a particular decision was made with a discriminatory intent: (1) the discriminatory impact of the official action; (2) the historical background of the decision; (3) the specific sequence of events leading up to the challenged action; (4) substantive and procedural departures from the normal decision-making

---

[73] *Edwards v. Aguillard*, 482 U.S. 578, 638 (1987) (SCALIA, J., dissenting) (citations omitted); *see also Hunter*, 471 U.S. at 228 ("Proving the motivation behind official action is often a problematic undertaking." (citation omitted)).

[74] *Alexander*, 602 U.S. at 43 (THOMAS, J., concurring in part) (quoting *Miller*, 515 U.S. at 915–16).

[75] *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 558 (1993) (SCALIA, J., concurring in part and concurring in the judgment) (citation omitted).

[76] 429 U.S. at 266–68; *see Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (en banc) ("We apply the framework articulated in [*Arlington Heights*] to determine whether SB 14 was passed with a discriminatory purpose.").

[77] *Arlington Heights*, 429 U.S. at 266.

process; and (5) contemporaneous viewpoints expressed by the decisionmakers."[78]

The district court found that the Challengers had not shown that the Commissioners Court acted with race as a motivating factor when it adopted Map 7. Because "[l]egislative motivation or intent is a paradigmatic fact question,"[79] we review that determination for clear error.[80] "Under that standard of review, we affirm the court's finding so long as it is 'plausible'; we reverse only when 'left with the definite and firm conviction that a mistake has been committed.'"[81] "This is a demanding test, but it is not a rubber stamp."[82]

The Challengers argue that the district court applied the wrong test—using the predominance standard applicable to *Shaw* claims rather than the *Arlington Heights* framework applicable to intentional-discrimination claims. If that is so, then the district court's "finding of fact [was] based on the application of an incorrect burden of proof" and thus "cannot stand."[83] However, we do not agree with the Challengers' reading of the district court's opinion. To be sure, the district court *did* conclude that one count in the Challengers' complaint raised a *Shaw* claim, and it applied the predominance test to that count. But it also understood two other counts as raising intentional-discrimination claims and applied the *Arlington Heights*

---

[78] *Fusilier*, 963 F.3d at 463 (citations omitted).

[79] *Prejean v. Foster*, 227 F.3d 504, 509 (5th Cir. 2000) (citing *Cromartie I*, 526 U.S. at 549).

[80] *See Abbott v. Perez*, 585 U.S. 579, 607 (2018) ("[A] district court's finding of fact on the question of discriminatory intent is reviewed for clear error." (citation omitted)).

[81] *Cooper*, 581 U.S. at 309.

[82] *Alexander*, 602 U.S. at 18.

[83] *Abbott*, 585 U.S. at 607 (citation omitted).

framework to those counts. That dual approach—performing both analyses in the face of the Challengers' less-than-crystal-clear framing of their claims—reflects caution, not confusion. The fact that the district court, faced with ambiguous pleadings, performed both the *Arlington Heights* analysis *and* the racial-predominance analysis is no reason to discount its factual findings under *Arlington Heights*. In short, its belt-and-suspenders prudence was commendable, not reversible.

Nor do the Challengers' arguments leave us with "the definite and firm conviction that a mistake has been committed."[84] The Challengers base their claim primarily on comments that County Judge O'Hare made in an interview with NBC 5 News. In the interview, Judge O'Hare stated:

> The policies of Democrats continue to fail Black people over and over and over, but many of them keep voting them in. It's time for people of all races to understand the Democrats are a lost party, they are a radical party, it's time for them to get on board with us and we'll welcome them with open arms.

As the Challengers see it, these comments are "as direct of evidence of intentional racial discrimination as can be imagined." Under *Arlington Heights*, "contemporary statements by members of the decisionmaking body" "may be highly relevant."[85] In this case, however, we agree with the district court that Judge O'Hare's "statement is not the smoking gun [the Challengers] think it is."

For one thing, the record does not disclose the context of Judge O'Hare's remark. The Challengers contend that Judge O'Hare made this statement "in the context of explaining his vote in favor of Map 7," but they

---

[84] *Cooper*, 581 U.S. at 309.

[85] *Arlington Heights*, 429 U.S. at 268.

cite no evidence for that assertion—and we have found none in the record. The NBC 5 broadcast shows Judge O'Hare making the quoted remark, but beyond that Judge O'Hare does not appear on the broadcast, nor does the broadcast otherwise disclose the context of his statement. In its brief on appeal, the County cites a YouTube video that allegedly adds context to the remark. However, this video was not part of the record before the district court, and so we cannot consider it.[86]

That missing context matters: if Judge O'Hare made his remark in response to a question that did not mention race and simply asked why he intended to vote for Map 7—as the Challengers imply—then his remark might be probative of a discriminatory purpose. If, however, Judge O'Hare made his remark in response to a question that itself raised the race issue— as the district court suggests—then his brief mention of race (and immediate pivot away from it) would have little or no probative value. At this stage, we cannot tell which is so. And given (1) the presumption of legislative good faith,[87] and (2) the clear-error standard of review, we cannot simply assume the worst.

Even taking the statement in isolation, it doesn't clearly suggest a discriminatory purpose. It's no secret that race and party affiliation are often highly correlated. The Supreme Court has acknowledged as much,[88] and

---

[86] *United States v. Muhammad*, 14 F.4th 352, 363 n.4 (5th Cir. 2021) ("This court generally does not consider evidence outside the record on appeal." (citation omitted)).

[87] *Alexander*, 602 U.S. at 6 ("[I]n assessing a legislature's work, we start with a presumption that the legislature acted in good faith.").

[88] *See, e.g.*, *Cooper*, 581 U.S. at 308 ("[O]f course, 'racial identification is highly correlated with political affiliation.'" (quoting *Easley v. Cromartie*, 532 U.S. 234, 243 (2001)).

courts in this circuit have too.[89] Indeed, the Challengers' own allegations and evidence underscore the same point.[90] A legislator's public acknowledgement of that basic fact does not, standing alone, demonstrate discriminatory purpose. To be sure, as the Challengers observe, districting decisions that rely on stereotypes about racial voting are constitutionally suspect.[91] But that fact cannot save the Challengers' claim. That's true for two reasons. First, that sort of stereotyping argument sounds in a *Shaw* claim, which the Challengers disclaim raising.[92] Second, and more fundamentally, the Challengers have not presented any evidence that Judge O'Hare was in any way motivated by such stereotyping.

Taken as a whole, the rest of the statement reflects ordinary partisan politics. It's hardly surprising that a Republican officeholder would criticize Democratic policies—or vice versa. Nor is it surprising that a Republican would urge voters "of all races" to vote Republican. We therefore are unpersuaded that Judge O'Hare's statement demonstrates a discriminatory purpose.

---

[89] *See, e.g.*, *Perez v. Abbott*, 390 F. Supp. 3d 803, 820 (W.D. Tex. 2019) ("The existence of high levels of racially polarized voting across Texas cannot be disputed, nor is there any indication that the levels of racially polarized voting are decreasing." (footnote omitted)).

[90] Because the Challengers' claim under Section 2 of the Voting Rights Act is not before us, we express no view on whether these allegations or this evidence are sufficient to show that any minority group in Tarrant County is "politically cohesive" or whether "the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." *Allen v. Milligan*, 599 U.S. 1, 18 (2023) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 51 (1986)).

[91] *See Bush*, 517 U.S. at 968 (plurality opinion) ("[T]o the extent that race is used as a proxy for political characteristics, a racial stereotype requiring strict scrutiny is in operation. We cannot agree with the dissenters that racial stereotyping . . . can pass without justification in the context of voting." (citations omitted)).

[92] *See Miller*, 515 U.S. at 912–13.

The Challengers also point to additional evidence that, in their view, suggests a discriminatory intent. First, they highlight the disproportionate number of black and Latino voters who will have their County Commissioner votes postponed to 2028. Under *Arlington Heights*, "[t]he impact of the official action"—specifically, "whether it 'bears more heavily on one race than another'"—"provide[s] an important starting point" for the legislative-purpose inquiry.[93] In an extreme case, where the evidence shows "a clear pattern, unexplainable on grounds other than race," the analysis is "relatively easy."[94] However, "such cases are rare," and absent an extreme disparity, "the Court must look to other evidence."[95]

Although we acknowledge that the disproportionate effect of the County's redistricting on black and Latino voters is relevant, we think its probative value is quite limited in this case. An obvious explanation for the disparity exists: race and partisanship are highly correlated in Tarrant County, and districting decisions driven by partisanship will often have disparate racial effects. But "a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact."[96] The Challengers' burden is to show that the Commissioners Court adopted Map 7 "'because of,' not merely 'in spite of,' its adverse effects"

---

[93] *Arlington Heights*, 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).

[94] *Id.* (citations omitted).

[95] *Id.* (citations omitted)

[96] *Cromartie I*, 526 U.S. at 551 (emphasis in original).

on minority voters.[97] Given the record before us, the disproportionate effect of the County's redistricting offers only marginal support for that conclusion.

Second, the Challengers rely on "[t]he historical background of the [redistricting] decision."[98] They note that "federal courts have held that Texas violated" the Voting Rights Act "[i]n every decade since the statute was passed in 1965."[99] They place particular reliance on a 2012 decision that found that the Texas Legislature intentionally discriminated in breaking up a state senate district "located entirely within Tarrant County."[100] But the weight of this evidence is limited. "The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination."[101] And past discrimination by the Texas Legislature is one step removed from discrimination by the Tarrant County Commissioners Court—a distinct legislative body.[102]

Finally, the Challengers suggest that various "[d]epartures from the normal procedural sequence" indicate a discriminatory purpose.[103] In particular, they rely on the Commissioners Court's decision to redistrict mid-cycle despite the absence of any legal requirement to do so, the absence of formal redistricting criteria, the speed of the redistricting process, the County's hiring of PILF to replace the law firm that had previously overseen

---

[97] *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (footnote omitted).

[98] *Arlington Heights*, 429 U.S. at 267.

[99] *LULAC*, 601 F. Supp. 3d at 170 (citing *Veasey*, 830 F.3d at 240).

[100] *See Texas v. United States*, 887 F. Supp. 2d 133, 162–66 (D.D.C. 2012), *vacated and remanded*, 570 U.S. 928 (2013).

[101] *Abbott v. Perez*, 585 U.S. at 603.

[102] *Cf. Veasey*, 830 F.3d at 232 (plurality opinion) (finding that actions by officials in one county are not "probative of the intent of legislators in the Texas Legislature").

[103] *See Arlington Heights*, 429 U.S. at 267.

the redistricting process in Tarrant County without conducting an open bidding process, and PILF's failure to engage in a public-input process or to give substantive legal presentations to the Commissioners Court, as its predecessor had done. But again, these alleged departures are only minimally probative of discriminatory intent. To start, the fact that PILF went about its task differently from its predecessor is not surprising; lawyers—and the learning models increasingly assisting them—often reach the same end by different means. The other departures are just as easily explained by a partisan motive as a racial motive; partisan gerrymandering is unlikely to be popular, so it is understandable that a legislature engaging in it would want to avoid an extensive, public process. While that may not be consistent with the best practices of good government, it is hardly suggestive of racial motivation. Similarly, the choice to redistrict mid-cycle is easily explained by a desire to reap partisan benefits in the 2026, 2028, and 2030 elections rather than waiting until 2030 (when Republicans may or may not control the Commissioners Court). So too, the speed of the redistricting process is easily explained by the tight timeline between the start of the process and the election. (Indeed, that is presumably why the Challengers asked both the district court and this court to put this case on the fast track.)

Taken as a whole, the Challengers' evidence does not leave us with a "definite and firm conviction" that the district court erred in finding that the Commissioners Court was not motivated by racial considerations.[104] Under *Arlington Heights*, the discriminatory-purpose inquiry is not a mechanical box-checking exercise that can be fulfilled merely by proffering any evidence that arguably fits within each of the factors. Rather, we must remain mindful of "the ultimate question," which is "whether a discriminatory intent has

---

[104] *Cooper*, 581 U.S. at 309.

been proved."[105] We do not think the district court clearly erred in concluding that it has not been. Accordingly, the Challengers are not likely to succeed on the merits of their race-discrimination claim.

## C. Vote Postponement

Finally, we turn to the Challengers' argument that the adoption of Map 7 unlawfully disenfranchises Tarrant County residents and lacks adequate justification. As discussed above, the Challengers are incorrect to claim that they—or anyone else—were disenfranchised by the County's redistricting: While they are ineligible to vote for a County Commissioner in their old precinct, they remain eligible to vote for a County Commissioner in their new one. In truth, their claims are about vote *postponement*; the election in which they are now eligible to vote will not occur until 2028, whereas the election in which they would have been eligible to vote will occur in 2026.

However, there is no constitutional right to vote "on a particular schedule."[106] This principle follows from the Supreme Court's summary affirmance in *Pate v. El Paso County*.[107] In *Pate*, the plaintiffs raised claims almost identical to the Challengers': arguing that "the realignment of the four commissioners precincts" in El Paso County caused "certain voters" to be "shifted" from one precinct to another and, as a result, postponed their votes from 1970 to 1972.[108] A three-judge district court rejected this claim,[109]

---

[105] *Abbott v. Perez*, 585 U.S. at 603 (quoting *Bolden*, 446 U.S. at 74).

[106] *Republican Party of Or. v. Keisling*, 959 F.2d 144, 145 (9th Cir. 1992) (per curiam).

[107] 337 F. Supp. 95 (W.D. Tex.) (per curiam), *summarily aff'd* 400 U.S. 806 (1970).

[108] *Id.* at 96.

[109] *Id.* at 100.

and the Supreme Court summarily affirmed.[110] Because *Pate* was a summary affirmance, it is "not of the same precedential value as . . . an opinion of [the Supreme] Court treating the question on the merits."[111] We cannot, for example, read the summary affirmance "as an adoption of the reasoning supporting" the three-judge court's judgment.[112] Nevertheless, we are "bound by [*Pate*] until such time as the Court informs [us] that [we] are not."[113] That binding effect "prevent[s]" us "from coming to opposite conclusions on the precise issues presented and necessarily decided" in *Pate*.[114] Thus, we cannot conclude that a jurisdiction violates the Constitution merely by redrawing its districts in a way that, under a staggered election system, results in some voters' votes being postponed.

Rather than arguing that they have a constitutional right to vote "on a particular schedule,"[115] the Challengers contend that the vote postponement at issue here is discriminatory and thus subject to heightened scrutiny. It is not clear, however, what axis of discrimination they invoke. To the extent they allege discrimination based on viewpoint or race, those arguments are duplicative of their previous viewpoint- and race-discrimination claims, which we have already rejected. It appears, however, that the Challengers instead contend the discrimination is simply between those voters who will wait only two or four years between County Commissioner elections and those who will have to wait six years. If that is the Challengers' argument, it

---

[110] 400 U.S. 806.

[111] *Edelman v. Jordan*, 415 U.S. 651, 671 (1974).

[112] *Zobel v. Williams*, 457 U.S. 55, 64 n.13 (1982).

[113] *Hicks v. Miranda*, 422 U.S. 332, 344–45 (1975) (cleaned up).

[114] *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam).

[115] *Keisling*, 959 F.2d at 145.

borders on frivolous. *Every* redistricting in a staggered system produces that effect; treating it as a constitutional violation would convert every routine redistricting in a staggered system into a matter of strict scrutiny.

In the alternative, the Challengers contend that we should subject redistricting decisions in jurisdictions with staggered election systems to the framework laid out in *Anderson v. Celebrezze*[116] and *Burdick v. Takushi*.[117] Under the so-called *Anderson-Burdick* framework, we would "examine two aspects" of a jurisdiction's redistricting choices: (1) whether [they] pose[ ] a 'severe' or instead a 'reasonable, nondiscriminatory' restriction on the right to vote and (2) whether the state's interest justifies the restriction."[118] As the Challengers see it, a State's districting decisions survive scrutiny under this framework if they are required by the one-person one-vote principle. However, a State's districting decisions are unconstitutional if they are motivated by "a desire to engage in partisan gerrymandering."

We reject the Challengers' proposed framework. First, it would lure us once again into policing partisan gerrymandering. But, as *Rucho* made clear, that sort of inquiry is "beyond the competence of the federal courts."[119] Second, *Anderson-Burdick* applies to laws that "burden a relevant constitutional right."[120] As we have explained, there is no constitutional right to vote "on a particular schedule."[121] Third, we are aware of no cases

---

[116] 460 U.S. 780 (1983).

[117] 504 U.S. 428 (1992).

[118] *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 235 (5th Cir. 2020) (quoting *Burdick*, 504 U.S. at 434).

[119] *See Rucho*, 588 U.S. at 707 (citation omitted).

[120] *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 138 (3d Cir. 2022).

[121] *Keisling*, 959 F.2d at 145.

applying *Anderson-Burdick* to redistricting decisions. Nor are we aware of any decision extending that framework to the process by which a jurisdiction modifies the rules of the electoral road—such as the choice to redistrict— rather than to the rules themselves—such as the map. Finally, the analysis the Challengers envision would require "the judiciary to decide whether any given election law is necessary," thus "allow[ing] a political question— whether a rule is beneficial, on balance—to be treated as a constitutional question to be resolved by the courts rather than by legislators."[122] As a result, "doggedly employing *Anderson-Burdick*" where it "has no application" would be nothing but "a camouflaged interest in asserting 'will' rather than 'judgment.'"[123]

The Challengers seek refuge in *Dunn v. Blumstein*, which they read for the proposition that "close scrutiny" "applies . . . to outright disenfranchisement (even when it is 'temporary')." In *Dunn*, the Supreme Court invalidated Tennessee's durational-residency requirement, which limited the franchise to those who had resided in the State for at least one year.[124] The Court held that strict scrutiny was appropriate because "[d]urational residence requirements completely bar from voting all residents not meeting the fixed durational standards."[125] But this case is worlds away from *Dunn*. Here, the Challengers will not cast a vote for County

---

[122] *Luft v. Evers*, 963 F.3d 665, 671 (7th Cir. 2020).

[123] *Daunt v. Benson*, 999 F.3d 299, 327 (6th Cir. 2021) (READLER, J., concurring) (quoting THE FEDERALIST NO. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961)).

[124] *See Dunn*, 405 U.S. at 331–33.

[125] *Id.* at 336; *see S.A. Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 37–38 (1973) (citing *Dunn* as an example of a case applying strict scrutiny). Separately, the Court held that heightened scrutiny was appropriate because durational-residency requirements burden the right to travel. *Dunn*, 405 U.S. at 338. That holding is not at issue here.

No. 25-11055

Commissioner in 2026—but in 2028, they will be able to vote for Commissioner when they otherwise would not have. By contrast, the would-be voter in *Dunn* was barred from voting in the 1970 election[126] and received no compensating additional vote thereafter; he could vote in later elections on the same terms as if there had never been a durational-residency requirement.

As one of our sister circuits has explained, plaintiffs in vote-postponement cases are unlike the plaintiff in *Dunn* because they are not "denied their right to vote in any regularly scheduled . . . election."[127] Rather, "[t]hey were able to vote in the regularly scheduled pre-reapportionment . . . elections in their old districts, and they will be able to vote in the next regularly scheduled general election for their new district."[128] The Challengers' real concern is not that they are being denied the right to vote in one of their precinct's elections—it is that the election will occur later than usual. But if we were to subject such timing adjustments to strict scrutiny, there would be no limiting principle. Could the same reasoning invalidate a decision to hold elections in odd years instead of even? In December instead of November? A week later than usual? A day? Could it be used to challenge opening the polls an hour later, taking a day longer to count the ballots, or extending the lame-duck period? The Challengers give us know way of knowing.

_____

[126] *Dunn*, 405 U.S. at 331.

[127] *Donatelli v. Mitchell*, 2 F.3d 508, 514–15 (3d Cir. 1993).

[128] *Id.* at 515.

No. 25-11055

Finally, to the extent the Challengers urge us to apply the rational-basis test,[129] Map 7 easily passes it. To be sure, *rational-basis review* is something of a misnomer: it is seldom rational, rests on little basis, and scarcely qualifies as review. Our court has aptly called it "a notoriously deferential standard"[130]—if "standard" is even the right word. Under rational-basis review, we uphold a classification "so long as there is 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'"[131] And there can be no serious doubt that staggered legislative terms are rational—indeed, the Constitution itself adopts that design.[132] The only remaining question, then, is whether any conceivable rational basis could support Tarrant County's decision to redistrict mid-cycle.

The most obvious reason for mid-cycle redistricting, of course, is partisan gain.[133] But even assuming the Challengers are correct that partisan advantage is not a legitimate government interest,[134] there are other reasons

---

[129] *See id.* at 514 ("Courts that have addressed equal protection claims brought by voters who were temporarily disenfranchised after a reapportionment have consistently applied rational-basis review." (collecting cases)).

[130] *Reyes v. N. Tex. Tollway Auth.*, 861 F.3d 558, 561–62 (5th Cir. 2017).

[131] *United States v. Skrmetti*, 605 U.S. 495, 522 (2025) (quoting *FCC v. Beach Commc'ns*, 508 U.S. 307, 313 (1993)).

[132] *See* U.S. CONST. art. I, § 3, cl. 2 (establishing a staggered election system for the Senate).

[133] *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 457–58 (2006) (STEVENS, J., concurring in part and dissenting in part).

[134] *But see id.* at 416–17 (majority opinion) (rejecting the argument that "[a] decision . . . to effect mid-decennial redistricting, when solely motivated by partisan objectives, violates equal protection and the First Amendment because it serves no legitimate public purpose and burdens one group because of its political opinions and affiliation"); *Alexander*, 602 U.S. at 6 ("[A]s far as the Federal Constitution is concerned, a legislature may pursue partisan ends when it engages in redistricting.").

a jurisdiction may decide to redistrict mid-decade. The district court identified one: the County's concern that the prior map had been rendered "constitutionally suspect" by the previous law firm's advice to maintain a "coalition district." We express no view on whether that constitutional concern was well founded. We note only that (1) the legal standard governing the permissible role of race in redistricting has long perplexed legislatures,[135] (2) under rational-basis review, it does not matter whether these constitutional concerns were the *actual* reason for adopting Map 7, so long as such a reason is *conceivable*,[136] and (3) although plaintiffs in rational-basis cases may "negate a seemingly plausible basis . . . by adducing evidence of irrationality,"[137] the Challengers have identified no such irrationality here. Because the adoption of Map 7 satisfies even the most charitable conception of rational-basis review, we need not decide whether the decision to adopt new district maps is subject to that standard at all.

In sum: Nothing in the Constitution forbids a jurisdiction from adopting a staggered election system. Nothing in the Constitution forbids a jurisdiction from redistricting mid-cycle. And nothing in the Constitution forbids a jurisdiction from combining the two—even when the practical result is that some voters must wait a bit longer to cast their ballots. The Constitution protects the right to vote, not the right to vote on a particular

---

[135] *See Louisiana v. Callais*, 145 S. Ct. 2608, 2610 (2025) (Thomas, J., dissenting) ("[D]ue to our Janus-like election-law jurisprudence, States do not know how to draw maps that survive both constitutional and VRA scrutiny." (cleaned up)).

[136] *Reyes*, 861 F.3d at 563 (quoting *FM Props. Operating Co. v. City of Austin*, 93 F.3d 167, 175 (5th Cir. 1996)).

[137] *Hines v. Quillivan*, 982 F.3d 266, 273 (5th Cir. 2020) (quoting *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013)).

No. 25-11055

timetable. Accordingly, the Challengers are unlikely to prevail on the merits of their vote-postponement claim.

\*    \*    \*

Because we conclude that the Challengers are unlikely to succeed on the merits of any of their claims, we do not address the remaining preliminary-injunction factors. Nor do we decide whether we are, at this point, already too close to an election for a federal court to intervene.[138]

## IV. Conclusion

We AFFIRM the district court's denial of a preliminary injunction.

---

[138] *See Purcell v. Gonzalez*, 549 U.S. 1, 5–6 (2006) (per curiam).